SHAFFER v. MARKS et al.

(District Court, E. D. Oklahoma. February 10, 1917.)

No. 2256.

*(Syllabus by the Court.)*

1. MINES AND MINERALS ⬦56, 74—OIL AND GAS LEASE—"PROPERTY."

An oil and gas mining lease, under the laws of Oklahoma, whether a chattel real, an incorporeal hereditament, or whatever termed, is nevertheless a right or interest relating to real estate, and, although not arising to the dignity of an estate prior to entry by a lessee, is "property," and as such the subject of transfer and sale.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 166, 202.

For other definitions, see Words and Phrases, First and Second Series, Property.]

2. COURTS ⬦312(1)—UNITED STATES COURTS—JURISDICTION—"SUIT TO RECOVER UPON A CHOSE IN ACTION IN FAVOR OF ANY ASSIGNEE."

An action in equity by the assignee of such lease to restrain others from operating the land for oil and gas is not a "suit to recover upon a chose in action by an assignee," within the provisions of section 24 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1091 [Comp. St. 1913, § 991]), prohibiting federal District Courts from entertaining suits to recover upon any promissory note or other chose in action in favor of an assignee.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 873-875.]

3. COURTS ⬦367—FEDERAL COURTS—FOLLOWING STATE COURT DECISIONS.

The federal courts, in determining cases before them involving state laws and rights accruing under those laws, are guided by the rules announced by the Supreme Court in Kuhn v. Fairmount Coal Co., 215 U. S. 360, 30 Sup. Ct. 140, 54 L. Ed. 228.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 958, 959.]

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. COURTS ☜365—MINES AND MINERALS ☜77, 78(2)—FEDERAL COURTS— FOLLOWING STATE COURT DECISIONS—OIL AND GAS LEASE—VALIDITY.**

In determining whether or not an Oklahoma oil and gas lease executed in 1912, reserving to the lessee the right to surrender said lease at any time upon the payment of $1 to the lessor, was a valid or void contract, resort will be had to the decisions of the Oklahoma courts rendered prior to the date of said lease, and in the absence of any decision holding such leases void, their validity will be determined from an examination of the general law on the subject. The opinions in Superior Oil & Gas Co. v. Mehlin, 25 Okl. 809, 108 Pac. 545, 138 Am. St. Rep. 942, decided in 1910, in Kolachny v. Galbreath, 26 Okl. 772, 110 Pac. 902, 38 L. R. A. (N. S.) 451, decided in 1910, and in Frank Oil Co. v. Belleview Gas & Oil Co., 29 Okl. 719, 119 Pac. 260, 43 L. R. A. (N. S.) 487, decided in 1911, examined, and found to fall far short of holding such leases void, but, upon the other hand treated such leases as valid, binding contracts, and not conferring upon or reserving to the lessor the right to decline to accept rentals for delay in drilling when properly tendered.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 950, 952, 955, 969–971; Mines and Minerals, Cent. Dig. §§ 204, 206.]

**5. MINES AND MINERALS ☜78(2)—OIL AND GAS LEASE—CANCELLATION.**

Under the decision of the United States Circuit Court of Appeals for the Eighth Circuit in Brewster v. Lanyon Zinc Co., 140 Fed. 807, 72 C. C. A. 213, decided in 1905, and the opinions of the Supreme Court of Oklahoma then handed down, an Oklahoma surrender clause oil and gas mining lease, executed in 1912 for a cash bonus of $120, *held* a valid and enforceable contract, and, though the lessee had the right to surrender the lease at any time, the lessor did not have the right to decline to accept rentals made in accordance with the terms of the lease, and cancel the lease within the five-year term; it not appearing that there was any threatened drainage of the property, or any undue delay in development after becoming practicable from the standpoint of marketing facilities.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 206.]

**6. MINES AND MINERALS ☜77, 79(6)—OIL AND GAS LEASE—CASH BONUS.**

The cash bonus of $120 supported each and every provision in said lease, and said lease being an indivisible contract, the cash bonus not only supported the full term of the lease, but the option of the lessee to keep the lease alive by tendering delay rentals.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 204, 209.]

**7. MINES AND MINERALS ☜77—OIL AND GAS LEASE—CONSTRUCTION.**

The surrender clause oil and gas mining lease will be strictly construed in favor of the landowner, the party who is bound, and against the lessee, the party not bound, following Kolachny v. Galbreath.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 204.]

**8. COURTS ☜354—MINES AND MINERALS ☜73—OIL AND GAS LEASE—RIGHTS OF LESSEE—FEDERAL COURTS.**

Whether an oil and gas lease confers upon the lessee a freehold estate, a chattel real, or an incorporeal hereditament is immaterial. An Oklahoma oil lessee acquires a vested right to enter and explore for oil and gas and appropriate the same according to the terms of the contract, and this vested right is as much entitled to the protection of a court of equity as a fee-simple estate in land, and in a proper case, irrespective of what remedy the state courts afford, federal equity will apply its own remedy.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 920, 934; Mines and Minerals, Cent. Dig. §§ 201, 210, 211.]

**9. MINES AND MINERALS ☜79(6)—OIL AND GAS LEASE—RENTAL—FORFEITURE.**

A lessee in either an "unless" lease or an "or" surrender clause lease, who intentionally fails to make a delay or rental payment at the time

and in the manner specified in the lease, cannot escape forfeiture of the lease by tendering payment out of time. But where it is his intention to make the stipulated payment in strict accordance with the terms of the lease, but his attempt to do so is abortive because of some accident or mistake, not the result of his willful neglect or gross negligence, a court of equity will grant him relief as against the forfeiture asserted by the lessor because of such failure, where the lessor has not suffered by the delay and it would be inequitable to enforce the forfeiture.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 209.]

Suit by Charles B. Shaffer against John H. Marks and McCartney, landowners, and Aggers, second lessee, to restrain said Aggers from drilling the land for oil and gas and to cancel Aggers' lease as cloud on title of complainant. Decree for complainant.

George S. Ramsey, Edgar A. De Meules, Malcolm E. Rosser, and Villard Martin, all of Muskogee, Okl., for complainant.

John Devereux, Bird S. McGuire, and F. B. Dillard, all of Tulsa, Okl., for lessors and C. D. Coggeshall.

Thomas H. Owen and J. C. Stone, both of Muskogee, Okl., and Edward H. Chandler, Farrar L. McCain, Randolph, Haver & Shirk, and John B. Meserve, all of Tulsa, Okl., for defendants.

CAMPBELL, District Judge. Without stating the case in detail, the court will outline the conclusions reached after a careful study of the voluminous record and the many authorities relied upon by counsel in support of their several contentions as to the law of this case.

[1, 2] At the threshold lies the question of the court's jurisdiction, raised by counsel for defendant Aggers by supplemental brief filed by leave of court after the case was heard and submitted upon the merits. As against the jurisdiction it is alleged that, inasmuch as it appears that the plaintiff, Shaffer, bases his right to the relief he prays upon an oil and gas lease[1] from certain of the defendants to one Terry, which Terry, in turn, assigned to Shaffer, it not appearing affirmatively that Terry was not a citizen of Oklahoma, Shaffer is therefore precluded from maintaining this action in this court by the provision of section 24 of the Judicial Code to the effect that:

"No District Court shall have cognizance of any suit * * * to recover upon any promissory note or other chose in action in favor of any assignee, * * * unless such suit might have been prosecuted in such court to recover upon said note or other chose in action if no assignment had been made."

It is contended that the oil and gas lease upon which plaintiff bases his right to the relief sought comes within the term "chose in action," as contemplated in the foregoing provision of the Code, and that this is essentially a suit to recover upon such lease, and is therefore a suit to recover upon a chose in action by an assignee whose assignor it does not appear could have maintained the suit in this court.

Upon consideration of the authorities, I conclude that this contention is not well founded, and that this court has jurisdiction of this controversy, notwithstanding plaintiff's assignor, Terry, may have been a citizen of Oklahoma. In considering the provision, "any suit to recover

---

[1] See note at end of case for copy of lease involved.

the contents of any promissory note or other chose in action in favor of any assignee," the Supreme Court of the United States, in the late case of Brown v. Fletcher, 235 U. S. 589, 35 Sup. Ct. 154, 59 L. Ed. 374, said:

"These were technical terms of variable meaning. They might have been given a literal construction, in which case the act would not have wholly remedied the evil intended to be corrected. They were also susceptible of a construction so broad as to include subjects far beyond the congressional policy. For a 'chose in action embraces in one sense all rights of action.' * * * So that, if the words of the statute had been given their most comprehensive meaning, every assignee or vendee would have been prevented from suing in the United States court unless the assignor could have maintained the action. It is evident, however, that there was no intent to prevent assignees and purchasers of property from maintaining an action in the federal court to recover such property, even though the purchaser was an assignee and the deed might, in a sense, be called a chose in action."

Whether the right conveyed by an oil and gas lease be termed a chattel real, an incorporeal hereditament, or what not, it is nevertheless a right or interest relating to real property, although not arising to the dignity of an estate, and as such right or interest is property, and may be the subject of transfer. The Supreme Court of this state (In re Indian Territory Illuminating Oil Co., 43 Okl. at page 316, 142 Pac. at page 100) said:

"Generally, an oil and gas lease, a school land lease, or a lease of any sort, for that matter, undoubtedly is property."

And in Kolachny v. Galbreath, 26 Okl. 772, 110 Pac. 902, 38 L. R. A. (N. S.) 451, it is held that, while an oil and gas lease does not vest in the lessee the title to the oil and gas in the land and is not a grant of any estate therein, it is, however, a grant of a right to prospect for oil and gas, an incorporeal hereditament. In Heller v. Dailey, 28 Ind. App. 555, 63 N. E. 490, it is said:

" * * * The owner of land is not, by virtue of his proprietorship thereof, the absolute owner of the oil and gas in and under it in its free and natural state, nor yet reduced to actual control of any person; but he, together with the other owners of land in the gas field, has a qualified ownership, consisting of or amounting to his exclusive right to do what may be done on, through, or under his land (as the making of wells), necessary to reduce the minerals to his possession, and, by thus acquiring the exclusive control, to become the owner of the mineral substances as his personal property, observing due regard in his operations to the like enjoyment of such exclusive right by all other landowners in like circumstances. This exclusive right is his private property. He cannot grant more than he owns. Therefore, by granting all the oil and gas in and under his land, he does not grant more than a right to reduce to ownership the oil and gas which may be obtained by operating on the land, whereby substances which, at the time of the making of the grant, may be in and under lands of other surface proprietors, may come into rightful ownership of the grantee as his personal property. Though, because of the peculiar nature of oil and gas, a corporeal interest in them in place cannot be created, and title to the specific mineral substances cannot be acquired without the reduction of them first to personal property, yet the exclusive and assignable right to do this, with the accompanying rights necessary to such accomplishment, constitutes, not a privilege revocable before it has been acted upon, but a subsisting, exclusive, assignable, and irrevocable right, which accrues upon the execution of the written instrument of conveyance and before any action has been taken thereunder. The right so created is not:

susceptible of livery of seisin, and is in the nature of an incorporeal hereditament. * * * While, for reasons which we have sought to state, we do not regard the contract in suit as a grant of land, or as a 'lease,' properly so called, but do regard it as a grant of a right in the nature of an incorporeal hereditament, operative from the time of its execution and during the accomplishment of its purpose as a transfer of an exclusive right to search for, take, and appropriate the minerals mentioned in the instrument, under whatever technical common-law term it may most properly be classed, it must be held to be a conveyance of an interest in land within the meaning of our statutes."

This suit, rightly understood, is an action by Shaffer to enjoin the invasion by certain of the defendants of this property right conveyed by the lease under which he claims, and which right he contends has not been forfeited. He is not seeking to enforce any executory contractual provisions of the lease. He is asserting no claim based upon either tort or breach of contract arising in favor of his assignor and assigned to him. I think the jurisdiction of the court in this case is clearly sustained by the reasoning of the following authorities, among others: Bushnell v. Kennedy, 9 Wall. (76 U. S.) 387, 19 L. Ed. 736; Ambler v. Eppinger, 137 U. S. 480, 11 Sup. Ct. 173, 34 L. Ed. 765; Mexican National R. R. v. Davidson, 157 U. S. 201, 15 Sup. Ct. 563, 39 L. Ed. 672; Brown v. Fletcher, supra; Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856; Oak Grove Construction Co. v. Jefferson County, 219 Fed. 860, 135 C. C. A. 528; Crown Orchard Co. v. Dennis, 229 Fed. 652, 144 C. C. A. 62.

[3] Now, as to the contention of counsel for defendant Aggers that under the terms of the lease of March 18, 1912, from Marks and others to Terry, the lessors had the right, regardless of whether it was tendered in strict accordance with the provisions of the lease, to refuse to accept the payment for June 18, 1915, and declare the lease contract terminated: Assuming, for the purpose merely of the consideration of this branch of the case, that the tender of the payment due June 18, 1915, was made by Shaffer in all respects in strict accordance with the terms of the lease, were the lessors or their assigns obligated to receive the same and continue the lease in force for the quarter for which such tender was made? The determination of this question involves a consideration of the terms of the lease and a construction thereof as to the respective rights reserved by the instrument to the several parties thereto. The estate and rights (as distinguished from remedies) created by the instrument under consideration, so far as determined by decisions of the Supreme Court of Oklahoma at the time this lease contract was entered into, must be accepted and applied by this court as rules of property in the consideration of this question. Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856. The extent to which such decisions are controlling in a case of this character is clearly defined by certain rules announced by the United States Supreme Court in Kuhn v. Fairmount Coal Co., 215 U. S. at page 360, 30 Sup. Ct. at page 143, 54 L. Ed. 228, as follows:

"We take it, then, that it is no longer to be questioned that the federal courts in determining cases before them are to be guided by the following rules: (1) When administering state laws and determining rights accruing under those laws, the jurisdiction of the federal court is an independent one,

not subordinate to, but co-ordinate and concurrent with, the jurisdiction of the state courts. (2) Where, *before the rights of the parties accrued,* certain rules relating to real estate have been so established by state decisions as to become rules of property and action in the state, those rules are accepted by the federal court as authoritative declarations of the law of the state. (3) *But, where the law of the state has not been thus settled,* it is not only the right but the duty of the federal court to exercise its own judgment, as it also always does when the case before it depends upon the doctrines of commercial law and general jurisprudence. (4) So, when contracts and transactions are entered into and rights have accrued under a particular state or local decision, *or when there has been no decision by the state court on the particular question involved,* then the federal courts properly claim the right to give effect to their own judgment as to what is the law of the state applicable to the case, even where a different view has been expressed by the state court after the rights of parties accrued. But even in such cases, for the sake of comity and to avoid confusion, the federal court should always lean to an agreement with the state court, if the question is balanced with doubt."

[4] It is insisted that the right of the lessor in a lease of this character to refuse to accept such payment of delay money is announced in at least three decisions of the Supreme Court of Oklahoma prior to the execution of this lease, or, if not specifically announced, that these decisions do announce principles of law which, when applied to this case, clearly support defendants' contention. The decisions referred to are Superior Oil & Gas Co. v. Mehlin, 25 Okl. 809, 108 Pac. 545, 138 Am. St. Rep. 942, decided in 1910; Kolachny v. Galbreath, 26 Okl. 772, 110 Pac. 902, 38 L. R. A. (N. S.) 451, decided in 1910; and Frank Oil Co. v. Belleview Gas & Oil Co., 29 Okl. 719, 119 Pac. 260, 43 L. R. A. (N. S.) 487, decided in 1911.

Superior Oil & Gas Co. v. Mehlin, supra, was a suit to specifically perform a certain contract of the defendant to execute to the plaintiff an oil and gas lease in such form as was then in use in the state of Kansas. The court concluded that the question as to whether specific performance of the contract to execute the lease would be decreed must depend upon whether the contemplated lease was one of which the court would decree specific performance. The requirements of a contract to warrant specific performance are set forth at page 815 of this opinion (108 Pac. 548, 138 Am. St. Rep. 942). The Kansas form of lease under consideration provided that "in consideration of one dollar cash in hand paid and the royalties, covenants, stipulations, and conditions hereinafter contained and hereby agreed to be paid, observed, and performed" by the lessee, the lessor "does hereby grant, lease, and let unto" lessee for the term of 15 years from date, and as long thereafter as oil and gas is produced from the land, all the oil and gas in and under the described tract. The lessee is made to covenant that it will commence operations upon the land within the term aforesaid and operate the same in good and workmanlike manner, etc. It is further provided that, in case operations as aforesaid are not commenced within the term aforesaid, the lessee shall pay the lessor $———, in advance, for each additional year such commencement is delayed from the end of the term aforesaid until the well is completed. As to this lease the court say:

"From the foregoing it will be noted that the lessee under the terms of the lease could delay the beginning of any well upon the land described for prac-

tically 15 years, and then, if at the end of that period of time he desired to delay longer, there was a proviso allowing it (for a consideration not specifically named) to hold the land indefinitely, without beginning any operations whatsoever. Thus, while by a decree defendant might be compelled to enter into this lease, no court could under its terms exercise any power to compel the lessee to operate. Under its terms it is left entirely to the action of the lessee to either drill for oil or gas, or not drill, and there is no forfeiture or burden provided for during this 15-year term, in which the lessee may deprive the owner of any of the benefits whatsoever, of having his land exploited. The general rule in such cases is that contracts unperformed, optional as to one of the parties, are optional as to both. Venture Oil Co. v. Fretts, 152 Pa. 451, 25 Atl. 732; Reese et al. v. Zinn et al. (C. C.) 103 Fed. 97; Federal Oil Co. v. Western Oil Co., 121 Fed. 674, 57 C. C. A. 428. The favorable presumptions which are usually indulged in behalf of ordinary lessees are not enjoyed by those holding leases of the character whose enforced execution is sought by plaintiff in this action, for the doctrine seems to be fundamental that, on account of the peculiar nature of the subject-matter upon which they operate, and the danger of loss to the lessor through the movement of the oil and gas to surrounding lands, and its withdrawal from neighboring wells, oil and gas leases are construed most strongly against the lessee and in favor of the lessor."

Kolachny v. Galbreath, supra, was also a case where the lessee was seeking to enforce specific performance of a lease. The opinion is by Justice Williams. In entering upon the consideration of the case the court says:

"It is essential to determine whether any of the following paragraphs of the oil and gas lease upon which this action was based precluded the plaintiff from obtaining relief in equity; said paragraphs being in hæc verba."

The court then sets forth the terms of the lease, which provided that in case no well be drilled within two years all rights under the lease should cease upon notice in writing being served by the lessor, unless the lessee should elect from year to year to continue the lease in force by paying an annual rental of $24 until a well should be drilled. The lease provided that the lessee should have the right to remove any and all fixtures placed upon the premises, and should have the further right at any time to surrender and terminate the lease by serving written notice upon the lessor of such intention, after which all payments or liabilities to accrue under the lease should cease. After reciting certain history of the case, the court says:

"Does the surrender clause as hereinabove set out render the lease such a contract as a court of equity will refuse to enforce?"

The court then quotes from Superior Oil & Gas Co. v. Mehlin, as above set forth. The court then observes that the lease under consideration differs from that in Superior Oil & Gas Co. v. Mehlin, in that it contains the surrender clause, citing Federal Oil Co. v. Western Oil Co., supra, to the effect that such contracts will not be specifically enforced, and citing in support thereof a number of other authorities outside of Oklahoma. All of these authorities have been examined, and are chiefly to the effect that specific performance will not be decreed where there is lack of mutuality of remedy. A few of them tend to support contention of counsel as to the option of the lessor to terminate the lease. The court then reviews certain Kansas and Illinois decisions touching surrender clause leases, to the effect that they are not

invalid, nor void for want of mutuality, it being the essence of an option contract that it is not mutual, the purchaser paying his money or doing what he agreed to do for the benefit whether he will perform or claim performance of the contract, and for the consideration received the seller parting with his right of choice; citing Poe v. Ulrey, 233 Ill. 56, 84 N. E. 46, and Pittsburg Brick Co. v. Bailey, 76 Kan. 42, 90 Pac. 803, 12 L. R. A. (N. S.) 745, and adding:

"But when relief is sought on such a contract in equity, it is not necessarily granted."

Then Watford Oil Co. v. Shipman, 233 Ill. 9, 84 N. E. 53, 122 Am. St. Rep. 144, is cited and quoted from to the effect that the surrender clause deprives the lessee of the remedy of specific performance until he has performed, or put himself in position where he can be compelled to perform, the contract on his part, because by virtue of the surrender clause he might, after decree in his favor, exercise his option to surrender the lease and thus put the court in the position of rendering a vain and useless decree. Justice Williams then proceeds:

"It is not essential to determine in this case as to whether such an option would be valid at law; it being obvious that under authorities heretofore cited, which seem to be supported by reason, equity will not decree that one party specifically perform a contract which the other party at its option may refuse to carry out. After the relief by decree should be granted to such party, he then under the cancellation clause of the lease would have it within his power to nullify the decree by exercising his right thereunder not to proceed further. A court of equity will not do a vain and useless thing by rendering a decree settling the rights of parties which one of them may at will set aside."

It appears, therefore, that instead of holding that the lessor or his assigns had the right to terminate the lease at will, and that such was done when her grantee, Severs, made the second lease and refused to accept the tendered payment to extend the first lease, and deciding the case upon that proposition, the court treats the lease as still in effect, but denies specific performance for lack of mutuality of remedy, specifically refraining from deciding the validity at law of the surrender clause. Then proceeding, the court further holds that the plaintiff must fail because of failure to make the delay payments in strict compliance with the terms of his lease. And with relation to these delay payments it is said:

"The tender of the rental for the year ended May 6, 1907, could keep the lease alive only for a year; that is, until May 6, 1907, at which time it expires unless continued by another valid tender."

The court, concluding, says:

"The lease relied upon by the plaintiff does not vest in him the title to the oil and gas in said land, and is not a granting of any estate therein; but is simply a grant of a right to prospect for oil and gas; no title vesting until such substances are reduced to possession by extracting same from the earth —an incorporeal hereditament."

The opinion in Frank Oil Co. v. Belleview Oil & Gas Co., supra, is also by Justice Williams. This case also involves a contest between a first and second lessee. The first lease was of the form commonly

known as an "unless" lease. It recited a consideration of "one dollar and the covenants and agreements hereinafter contained." It purported to grant all the oil and gas under certain described premises, together with the exclusive right to enter thereon for the purposes of drilling or operating for oil, etc., and the erection, maintenance, and removal of all structures, pipe lines, and machinery necessary for the production, transportation and storage of oil, etc. There was a provision for certain royalties on oil and gas produced. It was further provided that:

"If no well is commenced on said premises within one year from this date, then this grant shall become null and void, unless second party shall pay to the first party $80 for each year thereafter such completion is delayed, said rental to be paid quarterly in advance. * * * All rentals and all gas royalties mentioned herein shall be payable to the first party personally or deposited to his credit in the Bank of Mounds, of Mounds, I. T."

Regarding the contention of the Frank Oil Company that this was a lease from year to year, the court says:

"But the question here arises as to whether this contract is not merely an option to exploit for gas and oil."

Then is cited the holding in the Kolachny Case, supra, that such a contract amounts to a grant, not of the oil that is in the ground, but of such a part as the grantees may find, and passes nothing that can be the subject of ejectment or other real action—citing also Backer v. Penn Lubricating Co., 162 Fed. 627, 89 C. C. A. 419, to the effect that under such lease or contract the title to the oil in place is not in the lessee. The court then continues:

"The lease under these decisions does not have the effect of placing the title to the oil and gas that is under the surface of the land in controversy in the lessee, but to grant to the lessee the privilege of exploring for the oil and gas."

Then the court cites and quotes at length from Ohio Oil Co. v. Detamore, 165 Ind. 243, 73 N. E. 906, involving an oil and gas lease giving lessee, in consideration of $120, all the oil and gas under certain land, with the right to explore, and, in case no well should be completed within six months, the lease to be void unless the lessee should pay $120, in which event the lessee should have another six months; said lease being subject to continual renewal by succeeding payments, and the lease containing no promise by the lessee to do anything. Of this lease the Indiana court said, as appears from the quotation made by Justice Williams:

"Viewed from end to end, the contract amounts to nothing more or less than a six months option, with right of renewal, based upon a valid consideration, whereby the grantor bound himself not to lease the premises to another, and to give the grantee that length of time to consider and determine whether it would undertake the development of the land upon the terms named. * * * The rent, or option money, was paid in accordance with the contract to August, 1897, and included the six months ending at that time. Suppose, as the fact was, that thereafter for four years the company did not drill a well, make a payment, or have possession, and that appellee at that time brought an action to recover back rent, or option money, could it be said, under the contract in such a case, that non assumpsit would not have been a complete

.answer? Could not the appellant, Ohio Oil Company, have successfully said to the appellee, 'I did not promise to pay you money?' And it is certain that, if said appellant has the right to enter after the expiration of the said period, it was liable for the rent. Contractual rights and obligations are correlative."

The court holds the lessor could not have enforced the payment of rentals if the lessee had not obligated itself to pay the same; nor, on the other hand, was lessor obligated to permit lessee to enter after such forfeiture by failure to pay rent, and it was in this connection that the Indiana court observed that contractual rights and obligations are correlative. Dill v. Fraze, 169 Ind. 53, 79 N. E. 971, is also cited to the effect that the contract is not a lease in the sense of creating the relationship of landlord and tenant, and there is no implied covenant to pay the rentals.

Next the court cites Van Etten v. Kelly, 66 Ohio St. 605, 64 N. E. 560, to the effect that such a contract does not obligate the lessee to pay the rentals, and further that the lessee had the option to complete wells or pay rentals to keep the lease alive, and that upon breach of the agreement to complete wells, no action would lie for the recovery of the rentals. Next Justice Williams cites Glasgow v. Chartiers Oil Co., 152 Pa. 48, 25 Atl. 232, involving a lease identical in character with that in the Frank Oil Co. Case. Justice Williams quotes from the opinion in this case as follows:

"Appellant contends that, because he might pay, under the terms of the contract, he may be compelled to pay. But payment was the means provided by the contract by which the exercise of the right of the lessor to assert a forfeiture could be postponed. If the lessee did not wish to postpone the exercise of such right, he had only to refrain from making the payment."

He then cites Snodgrass v. South Penn Oil Co., 47 W. Va. 509, 35 S. E. 820, quoting from the syllabus, from which it appears that in the case of an "unless" lease it was held that the provision for payment of a certain quarterly rental in advance for delay in operation did not bind the lessee to pay such delay money, and that the lessor could not maintain the action to collect the same.

After this extended review of the decisions in other states, Justice Williams says:

"Under the lease in the case at bar, no obligation existed on the part of the lessee to pay delay or rent money, and the contract was in effect an option during a certain period to explore for oil and gas; but as a condition to this option the delay or rent money must be paid at the rate of $80 per year, quarterly in advance."

This is far from holding that, inasmuch as the lessee enjoys such option, the lessor also enjoys the correlative option of refusing to accept the quarterly payments which condition such option. After citing Superior Oil & Gas Co. v. Mehlin, supra, to the effect that in Oklahoma such leases are construed most strongly against the lessee, Justice Williams says:

"This contract is an option to explore for gas and oil. The rule is settled by this court that, when contracts are optional in respect to one party, they are strictly construed in favor of the party that is bound and against the party that is not bound."

But this is also far from holding that, because it is optional with the lessee as to whether he shall make the delay payments and thus extend his option, or refrain from making them and thus give operation to the forfeiture clause, it is likewise optional with the lessor whether he will accept the delay payment if tendered by the lessee according to the terms of the contract. On the other hand, it is a distinct recognition of the fact that the lessor by his contract has obligated himself to accept such payments as a condition of the extension of the option, if made within the prescribed time. But, in view of the peculiar nature of these oil and gas leases, they are to be strictly construed against the lessee; hence he must make sure to comply strictly with the terms of his contract as to such payments, if he would avail himself of the option. It seems to me there can be no doubt that such is the conclusion reached by Justice Williams in this case, for he then proceeds:

"Here we have a contract that is unilateral; the lessee being bound to do nothing, except at his own option. It has expended no money by way of developing the lessor's property. * * * This contract clearly contemplated the exploration for oil as a speculation or promotion on the part of the lessee, which is permissible under the law. The consideration for the first year's delay in making this development on lessor's tract was $200 cash in hand paid. * * * That year elapsed and no well was sunk or begun on the tract of the lessor. The lessee had the option to be allowed additional time as delay in the exploring of lessor's tract by paying to the lessor $80 for each year thereafter such completion was delayed, such delay money to be paid quarterly in advance."

This option, which Justice Williams says the lessee had to be allowed additional time as delay in exploring for oil by paying the quarterly rentals in advance, of course, must be found in the original lease, and must be supported by the consideration recited in that instrument. No intimation is found in this or any previous opinion of the Supreme Court of Oklahoma that such an option contract is not valid and binding as between the landowner and the person taking such option, even where it relates to exploration for oil and gas. Such options were, however, as we have already seen, to be strictly construed in favor of the landowner who is bound thereby, and against the optionee, not bound, unless he choose to exercise the option, which is, of course, the very essence of an option contract.

Then in reference to the contention of Frank Oil Company that, because the first and second quarterly payments had been made and accepted, the lessee's right as to that particular year became one of tenancy rather than option, and that because of certain circumstances surrounding these former payments the lessor was estopped to claim any forfeiture by reason of delay in the third payment, Justice Williams, in denying the contention, says:

"This would violate the settled rule of construction that an option is to be construed liberally in favor of the party granting it and strictly against the holder thereof. If a clause in an option contract or lease is intended to be, not a part of the option, but a rental contract binding the lessee to pay a certain rent, the parties thereto should have made such intention reasonably certain, especially so in view of the settled rules of construction as to option contracts. Every intendment by presumption is here in favor of the lessor.

Reasonable construction of this language is that, if no well is commenced on the premises within one year from the date of the lease, then the grant shall become null and void unless the lessee shall pay to the first party at the rate of $80 per year for each year thereafter such completion is delayed; said delay money, called 'rental' to be paid quarterly in advance. Default having been made in the payment of the third quarter, for what reason should a court of equity intervene to save the lessee from forfeiture? Unless some equitable reason exists, no court of chancery should have the hardihood to intervene against the rules of law and interfere with the letter of this contract."

The circumstance which defeated the Frank Oil Company in this case was the failure to pay the third quarterly payment strictly in accordance with the terms of the lease. Applying the doctrine of strict construction against the lessee which prevailed in Oklahoma, this default worked a forfeiture of the lease as a matter of law, and Justice Williams held that no equitable reason appeared why a court of equity should intervene to save the lessee from such forfeiture. After a further review of the authorities, Justice Williams says:

"We have been unable to find a single case where a court of chancery ordered the specific performance of a lease at the instance of a lessee, where there had been no development and the lease provided only that it should be forfeited unless the lessee pay a certain sum of money for delay, such contract being merely optional; but, where the contract provided that there should be certain development, or the lessee should pay a certain specific sum of money, then, in the event of delay or failure of development, an obligation was incurred on the part of the lessee to pay a certain sum of money."

The effect of this last observation is that, notwithstanding the recognized validity as an option contract (to be strictly construed, however, as against the optionee) of an oil lease wherein the lessee was not bound either to drill or pay, no cases are found where courts of equity have extended to the lessee in such lease the remedy of specific performance, but that, where the contract is to either drill or pay, an obligation exists to pay in default of drilling. Certainly there is in this statement no intimation that the lessor in such lease may refuse to accept a payment tendered in compliance with the contract. This case was decided, not on this theory, but on the theory that the lessee was in default for not having tendered the payment on time.

My conclusion on this branch of the case is that there is nothing in these several Oklahoma cases above reviewed which may reasonably be said to support the contention, made in behalf of defendant Aggers, that under the terms of the lease in question the lessors had the right, even though it be tendered in strict accordance with the terms of the lease, to refuse to accept a quarterly payment when due, and thereupon declare the lease contract terminated, notwithstanding the lease contained the surrender clause. While these cases denied to the lessees under the several circumstances attending the respective leases involved the equitable remedy sought, they do not hold such leases invalid as a matter of law, nor in my judgment do they intimate such a holding. Not until the case of Hill Oil & Gas Co., 157 Pac. 710, decided on rehearing June 6, 1916, more than four years after the rights accrued under this lease, do I find any decision of the Supreme Court of this state intimating that it had ever held that a lease such as this

gave the lessor the right to refuse to accept stipulated payments of delay or rent money, if paid in strict accordance with the terms of the lease. In that case it was said that:

"The rule in this state is that contracts unperformed, *without sufficient consideration*, which are optional as to one, are optional as to both."

Following that case a few months, and on October 10, 1916, the case of Brown v. Wilson, 160 Pac. 94, was finally decided by that court, wherein it was said of a lease similar to this (see syllabus):

"Where such lease reserves to the lessee and his assigns the right at any time after four months, on the payment of $1 and all payable obligations then due the lessor or his assigns, to surrender the lease, if not tested, for cancellation, held that, as said lease, construed as a whole, confers on the lessee an option to complete a well within four months or pay for delay and a further option to surrender at any time after four months, and thereby avoid doing both, it was voidable at the option of the lessor at any time after four months for lack of mutuality, in that it imposed no legal obligation on the lessee; that, as prospective royalties were the sole consideration for the execution of the lease on the part of the lessor, payment of which could be defeated by a surrender thereof by the lessee, the lease was nudum pactum; and that, as the same reserves to the lessee the right to surrender the lease at any time after four months before development, a corresponding right exists in the lessor to compel a surrender."

It will be seen from an examination of Brown v. Wilson, supra, that in that case the court first considered the question as to whether the lessees had not forfeited their rights under the lease by failure to make the payments of delay or rent money, in strict accordance with the terms of the lease, and decided that there had been such delay as entitled the lessor to assert and have declared a forfeiture, very much as was done in the Frank Oil Co. Case, supra. And if, at the time this last-mentioned case was decided, the court had entertained the same view as to the right of the lessor to refuse to accept a payment tendered in strict accordance with the terms of the lease, no reason is perceived why the court would not in that case have announced the doctrine which would have been decisive of that case, without the necessity of determining whether or not the delay in the tendering of such payment worked a forfeiture. The very fact that the court did not do so, together with the observations made by the court in the Frank Oil Co. Case and prior cases to which reference has already been made, it seems to me warranted the conclusion, until the announcement in the Hill Oil & Gas Co. Case and Brown v. Wilson, that the "or" surrender clause lease, like the one at bar, as well as the "unless" lease, based upon a valuable consideration, while probably not the subject of equitable relief by way of specific performance in the state courts, were, however, valid contracts in the nature of options to the lessee to explore for oil and gas during the initial period fixed and such additional time as might be secured by such subsequent payments as the lease provided for, and that the initial consideration covered not only the first period mentioned, but also the right to extend the time by making the delay or rent payments in accordance with the contract, and that the lessor was bound to accept such delay or rent payments when so made. In October, 1915, the Supreme Court of

Oklahoma, speaking through Commissioner Devereux, in Mitchell v. Probst, 152 Pac. 597, said of an "unless" lease, after reviewing the several Oklahoma decisions heretofore referred to:

"As construed by this court in the cases above cited, the legal effect of the contract was that, if a well was not drilled on the land within one year from the date of the contract, the agreement should be null and void, but with an option to the plaintiffs in error to continue their license under the agreement by paying in advance a rental of $2.50 per acre for the first year and $5 per acre thereafter until a well was drilled or the lease canceled."

The right to explore for oil and gas is a proper subject of contract between parties competent to contract. This right which the landowner enjoys he may assign or transfer as he may any other interest or estate in the land. As to the terms he shall impose, he certainly has a legal right to determine. As said by Story (1 Eq. Juris. § 244):

"The mere inadequacy of price or any other inequality in the bargain is not, however, to be understood as constituting per se a ground to avoid a bargain in equity; for courts of equity, as well as courts of law, act upon the ground that every person who is not from his peculiar condition or circumstances under disability, is entitled to dispose of his property in such manner and upon such terms as he chooses; and whether his bargains are wise and discrete, or profitable or unprofitable or otherwise, are considerations, not for courts of justice, but for the party himself to deliberate upon."

[5] The intention of the parties is to be ascertained from the written contract (section 949, Rev. Laws, 1910); and, as said in Brewster v. Lanyon Zinc Co., 140 Fed. 807, 72 C. C. A. 213:

"The lease expresses the intention of the parties, and, no rule of law forbidding, that intention is controlling. The consideration of $1, the receipt of which was acknowledged, although small, was yet sufficient to make the lease effective and to support every stipulation in it favorable to the lessee, including the option to surrender it at any time."

This last-mentioned case is very instructive on this phase of this case, and, in the absence of any controlling decision by the state Supreme Court prior to 1916, strongly supported the validity of such leases in this jurisdiction. Thousands of such leases were entered into on the faith that the lessor, notwithstanding the surrender clause, was bound to accept the rent or delay payments if tendered in accordance with the contract, and many thousands of dollars have been paid as such rentals. Such became a standard form of commercial lease, and a form similar in respect to the surrender clause was adopted by the government in the matter of leasing Indian lands. Until the question was decided to the contrary in the cases of Hill Oil & Gas Co. and Brown v. Wilson, supra, and especially at the time the lease in controversy was entered into, while there had been no specific decision of the state Supreme Court on the question, the existing state statutes and expressions of the state Supreme Court on kindred matters, and the federal decisions of this circuit, in my judgment were such as to justify the conclusion that, when the state Supreme Court should come to decide the specific point, it would hold that in such a lease as this, and under the circumstances here presented, the lessor is bound to receive the stipulated delay or rent money, if tendered by the lessee in accordance with the terms of the lease. The record con-

vinces me that the contracting parties considered the law so to be when contracting, and, obedient to the doctrine announced in Kuhn v. Fairmount Coal Co., supra, it is my judgment that the rights of the contending parties should be determined accordingly.

[6-8] In determining the jurisdictional question treated at the beginning of this opinion, the nature of the right which Shaffer enjoyed under this lease was considered. From what was said there it must follow that the property right or interest growing out of the lease was a vested right or interest, notwithstanding the fact that it did not amount to an estate in the land, because, even though an incorporeal hereditament or a chattel real, still it was a substantial right to go upon the land and take such oil and gas as he might discover, to the exclusion of every one else, so long as the right continued in him. That such right meets all the requirements of a vested right, see Pearsall v. Great Northern Ry., 161 U. S. at page 673, 16 Sup. Ct. 705, 40 L. Ed. 838. It is to protect himself in the exercise of this vested right against the acts committed or threatened by certain of the defendants, which, if permitted would destroy such right, that the plaintiff seeks injunctive relief. That such relief may properly be granted in a federal court of equity, in a case where such right is established and such interference therewith appears to be in progress or threatened, and for which the law offers no adequate remedy, I think cannot be seriously questioned. Aside from the question as to whether the circumstances surrounding the payment or attempted payment of the quarterly rental due June 18, 1915, worked a forfeiture of Shaffer's rights under the lease from which he ought not to be relieved, which will be considered later, the decision of the United States Supreme Court, in Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856, seems to me controlling here. In that case it was said:

"The Supreme Court of Illinois, while fully sustaining the right to maintain such a suit in the courts of the state when the lease contains no clause giving the lessee an option to surrender it (Gillespie v. Fulton Oil & Gas Co., supra), holds that the presence of such a clause in the lease operates to prevent the lessee from directly or indirectly enforcing it in equity (Walford Oil & Gas Co. v. Shipman and Ulrey v. Keith, supra); the ground of distinction being that the surrender clause, although lawful in itself and not affecting the validity of the lease, renders it so lacking in mutuality that equity will remit the lessee to his remedy at law. These decisions, it is insisted, should have been accepted and applied by the Circuit Court. To this we cannot assent. By the legislation of Congress and repeated decisions of this court it has long been settled that the remedies afforded and modes of proceeding pursued in the Federal courts, sitting as courts of equity, are not determined by local laws or rules of decision, but by general principles, rules, and usages of equity having uniform operation in those courts wherever sitting. Rev. Stat. pp. 913, 917; Neves v. Scott, 13 How. 268, 272 [14 L. Ed. 140]; Payne v. Hook, 7 Wall. 425, 430 [19 L. Ed. 260]; Dodge v. Tulleys, 144 U. S. 451, 457 [12 Sup. Ct. 728, 36 L. Ed. 501]; Mississippi Mills v. Cohn, 150 U. S. 202, 204 [14 Sup. Ct. 75, 37 L. Ed. 1052]. As was said in the first of these cases, 'Wherever a case in equity may arise and be determined, under the judicial power of the United States, the same principles of equity must be applied to it, and it is for the courts of the United States, and for this court in the last resort, to decide what those principles are, and to apply such of them, to each particular case, as they may find justly applicable.'

"It next is insisted that according to the general principles and rules of equity administered in the federal courts the surrender clause constitutes an insuperable obstacle to granting the relief sought; the argument being .that, as the complainants have a reserved option to surrender the lease at any time, it cannot be specifically enforced against them, and therefore cannot be similarly enforced in their favor. The rule intended to be invoked has to do with the specific performance of executory contracts, is restrained by many exceptions, and has been the subject of divergent opinions on the part of jurists and text-writers. Without considering it in other aspects, we think it is without present application. Rightly understood, this is not a suit for specific performance. Its purpose is not to enforce an executory contract to give a lease, or even to enforce an executory promise in a lease already given, but to protect a present vested leasehold, amounting to a freehold interest, from continuing an irreparable injury calculated to accomplish its practical destruction. The complaint is, not that performance of some promised act is being withheld or refused, but that complainants' vested freehold right is being wrongfully violated and impaired in a way which calls for preventive relief. In this respect the case is not materially different from what it would be if the complainants were claiming under an absolute conveyance rather than a lease. In a practical sense the suit is one to prevent waste, and it comes with ill grace for the defendants to say that they ought not to be restrained because, perchance, the complainants may some time exercise their option to surrender the lease. We think this option, which has not been exercised and may never be, is not an obstacle to the relief sought.

"Another contention of the defendants is that the lease is so unfair and inequitable in its terms that relief in equity should be withheld and the complainants left to seek remedy at law, which is tantamount to saying that they must submit to the practical destruction of their leasehold and accept such reparation as may be obtained through recurring actions for damages. Whether the lease is unfair and inequitable must be determined in view of the circumstances in which it was given. Willard v. Tayloe, 8 Wall. 557, 570, 571 [19 L. Ed. 501]; Marble Company v. Ripley, 10 Wall. 339, 357 [19 L. Ed. 955]; Franklin Telegraph Co. v. Harrison, 145 U. S. 459, 473 [12 Sup. Ct. 900, 36 L. Ed. 776]. They were these: Whether the leased tract contained oil or gas was not known. It was in an undeveloped district in which there was no oil or gas well and no pipe line leading to a market. Drilling wells was attended with large expense, the cost of each well being upwards of one thousand dollars, according to the testimony of one of the defendants. No fraud, deception, or overreaching was practiced in procuring the lease. The parties were competent to contract with each other, and entered into the lease because in the circumstances its provisions were satisfactory to them. Under its terms the cost of the drilling was to be borne by the lessee. If the undertaking was unsuccessful, he alone was to stand the loss; and if it was successful the lessor was to share in the results by receiving substantial royalties, the reasonableness of which is not questioned. The consideration for the lease, viz., $1 paid to the lessor and the covenants and agreements of the lessee, cannot be pronounced unreasonable. Similar leases resting upon a like consideration often have been sustained in cases not distinguishable from this. The lease was to remain in force five years and as much longer as oil or gas was being produced from the premises; in other words, it was to expire in five years unless oil or gas was produced within that time. The lessee expressly covenanted to drill a well within nine months or to pay a rental of 25 cents per acre per year quarterly, in advance, for such time as the completion of the well was delayed beyond that period, the delay, of course, not to extend beyond the primary term of five years. The terms of the covenant doubtless were suggested by the undeveloped condition of the district and by the expense and risk incident to exploring for oil and gas. They evidently were satisfactory to the lessor at the time, and the record discloses no reason for holding that in the circumstances they were unreasonably liberal to the lessee. Some criticism is directed against the reserved option to surrender, but it is difficult to perceive how it could be declared inequitable. If it was not exercised the lessee would be bound by his covenants, and if exercised the lessor would be free to deal with the premises as he chose. A surrender was not to affect any existing liability, but only to

avoid those 'thereafter to accrue.' A like clause is in the subsequent lease, and, according to the evidence and several reported decisions, is of frequent occurrence in such instruments. We conclude that there is nothing in the terms of the lease which requires that equitable relief be withheld."

That the vested right which was the subject of relief in Guffey v. Smith, supra, amounted to a freehold interest, while here the same character of right is declared to be an incorporeal hereditament or chattel real, it seems to me is immaterial. Shaffer's lease vested in him a property right, in the exercise of which he could do everything which the lessee in Guffey v. Smith could do. An interference with the exercise of the right, in either case, would result in identically the same character of injury. All the considerations recited by the court in the Guffey-Smith Case, as refuting the contention that the terms of the lease involved were unfair and inequitable, are presented by the record in this case. The land here leased was in an undeveloped district, several miles from the nearest production and with no pipe line facilities. No fraud or deception is charged in the procurement of the lease. The parties were competent to contract, knew exactly the contract they were entering into, and it was entirely satisfactory to them. Shaffer was to bear all the expense of drilling. If unsuccessful, he alone stood the loss; if successful, the lessors were to share in the results by receiving substantial royalties, the reasonableness of which is not questioned. The cost of sinking a well was about $13,000. It was upwards of $1,000 in the Guffey-Smith Case. There the cash consideration named was $1; here it is $120. In both leases the term was five years and as much longer as oil and gas might be procured. There the surrender clause was unlimited; here it is termed to become of no effect upon the commencement of a suit by the lessee to enforce the lease in any way. The Supreme Court found nothing in that surrender clause precluding equitable relief. It does not appear from the record that Shaffer was disposed to further delay development of this property whenever necessary to protect it against drainage, or in fact whenever it should become practicable from a standpoint of marketing facilities. The record shows he drilled the first producing well in the Cushing field, of which this was an extension, and, when prevented by the defendants from drilling upon the land in controversy, proceeded to sink a well upon the adjoining 40, and at his own risk and expense proved this territory. That this lease meets all the requirements of the federal courts in granting equitable relief, in so far as being a fair and equitable contract is concerned, cannot be doubted. No inequitable conduct in relation to the transaction can be ascribed to Shaffer, and he comes into court with clean hands.

Did Shaffer forfeit his rights under this lease by reason of the circumstances attending the payment or attempted payment of the rental due June 18, 1915? By the terms of the lease, if a well were not commenced on the premises within 12 months, he was to pay thereafter the sum of $120 per year, payable quarterly in advance, until a well was commenced. These payments could be made directly to the lessors, or deposited to their credit in the Cushing State Bank,

Cushing, Okl. Later the lessors sold 40 acres of the land to other parties, to whom Shaffer thereafter paid the proportion of the rental applying to that 40, and that tract is not now in controversy. Subsequently some differences arose between H. L. Marks, one of the lessors, and the Cushing Bank, whereupon Marks wrote Shaffer, requesting him to send all payments thereafter to his address in Kansas City, Kan. Then ensued correspondence between Shaffer and Marks relative to the title to the land in controversy having passed to W. J. Blane and wife; Marks furnished to Shaffer abstracts showing the title in Blane and wife, also power of attorney, executed by Blane and wife, appointing Marks, their sole and exclusive agent for the purpose of collecting and receiving such lease rentals. Shortly thereafter, and on March 5, 1915, Marks wrote Shaffer again, refusing to receive payments through the Cushing Bank, directing that they be sent direct to him at Kansas City, Kan., or that they be sent to the Central State Bank at Kansas City, Kan., to be put to his credit as agent. In this letter he said:

"Mr. Blane wants his money, and, if not settled at once, they advise him to release; but as your time is so near up, and I think you will soon develop, I am advising Mr. Blane to let it remain with you. While he is offered a big bonus and the parties will develop at once," etc.

It must be remembered that the trouble which Marks had with the Cushing Bank was in no respect caused by any delinquency on Shaffer's part. He had been making his payments just as the lease provided. On March 10, 1915, Shaffer answered Mark's letter of the 15th, stating:

"Since you have requested that no more rentals be sent to that bank [the Cushing Bank], we are to-day changing our records to show that future payments of the $20 quarterly to your credit as agent for Mr. Blane and wife will be made at the Central State Bank, Kansas City, Kan., so the rental which will be due the 18th inst. will be sent within the next few days to the last-named bank."

This March payment was accordingly sent in due time to the Kansas City bank, to be credited to Marks as agent. The next payment was due June 18, 1915. On the 4th of that month Shaffer wrote the Kansas City bank, inclosing Chicago exchange for $20, with directions to credit it to William J. Blane in payment of oil and gas lease rentals. This letter reached the bank about the 5th or 6th of June. This Chicago exchange, Mr. Lawrence, the president and cashier of the bank, testifies he considered good and treated as cash, and that it would have been cashed and paid to William J. Blane at any time before Marks' notice not to do so, if Blane had called. So that for the purpose of this case it must be treated as so much cash delivered to the bank to be placed to the credit of Blane. In regard to this Shaffer alleges in his petition that the records of his office showed Blane and wife were the owners of the property, and that by mistake and accident he directed the bank to place the money to the credit of Blane instead of Marks; that this mistake was innocently made, and without any intention to defraud or wrong any of the parties. As Blane had no account and was unknown to the bank, it was

held awaiting his appearance. Shaffer's attention was first called to this mistake by wire from his agent, Rumbaugh, at Cushing, on June 26th, advising that Marks was there for his check, and that the Kansas City bank advised no rental deposited to credit of William J. Blane or H. L. Marks, agent. In answer to this wire and on the same date, Shaffer wired Rumbaugh that rental had been sent to the bank, and if not there must have been lost in transit, and for him to pay the amount to Marks, if there. On the same day Marks wrote the Kansas City bank, from Drumright, Okl.:

"Please do not receive any checks from C. B. Shaffer to W. J. Blane or H. L. Marks, Agent, as we have canceled C. B. Shaffer lease."

On the 28th Shaffer wired the Kansas City bank to wire answer whether exchange sent in his letter of the 4th had been received, to which the bank responded on the 29th:

"Received remittance Wm. J. Blane. No specific instructions, except credit him. Party unknown to us. Still holding item."

On the same date Shaffer wired the bank to credit the account of H. L. Marks, agent for Blane, with remittance, and to notify Marks at his Kansas City, Kan., address, to which the bank the same day responded:

"Crediting H. L. Marks, Agent, $20, as per message. Notifying him."

Immediately thereafter the bank wired Shaffer that they were returning the remittance under Marks' instructions, and on the same date returned the remittance to Shaffer with a letter confirming the telegram. On the 30th Shaffer returned the remittance to the Kansas City bank, again requesting its deposit to the credit of Marks as agent. On July 2d the Kansas City bank again returned the draft to Shaffer, stating:

"We are under instructions from Mr. Marks not to accept any deposits from Mr. Shaffer for his credit."

Thus the matter stood, Shaffer standing ready to pay Marks, and Marks refusing to accept the payment, until the following August. In the meantime the title to the land had vested in Marietta Marks and one McCartney. On August 23, 1915, Marietta Marks and McCartney each executed an oil and gas lease to the defendant Aggers, covering their respective portions of this land, in which leases it was provided, among other things:

"The party of the second part agrees to commence a well on said premises within 30 days after the lease now held by C. B. Shaffer has been canceled or surrendered, or pay at the rate of one thousand dollars, payable quarterly in advance, for each additional year such commencement is delayed from the time above-mentioned for the commencement of such well, until a well is completed."

Contemporaneous with each of these leases to Aggers was a written agreement between the same parties reciting the existence of Shaffer's lease and the election of the lessors to cancel the same for failure to pay this June rental; that the lease was a cloud upon the title to the land, and an agreement by Aggers the lessee, at his own expense, to

institute suit in the name of the lessors against Shaffer to cancel this lease. Aggers parted with nothing in consideration for these leases. Presumably he was apprised of all the facts attending the June payment, and knew of the controversy between Shaffer and the landowners regarding the same. His leases and contracts were so drawn as to make his obligations thereunder only attach after the Shaffer lease should be canceled. Hence his rights are no greater than were those of Marks and McCartney at the time he contracted with them. Marks and McCartney have since settled their differences with Shaffer, so that the question as to whether Shaffer shall be relieved from his mistake in sending the remittance to the credit of Blane instead of Marks, agent, concerns chiefly Shaffer, on the one side, and Aggers, on the other.

[9] As has been said, there was that in the Oklahoma decisions, prior to the Hill Oil & Gas Case and Brown v. Wilson, which may be said to have established the doctrine in this state that oil and gas leases should be construed most strongly against the lessee. In the case of an "unless" lease, of course, by its very terms it becomes null and void when the lessee intentionally fails to make the payment at the time and in the manner stipulated. In the case of an "or" surrender clause lease, it has been held that the lessor could elect as to whether he would cancel and terminate the lease for nonpayment, or treat it as continuing in force, and collect the stipulated rental. McKee v. Grimm, 157 Pac. 308. An intentional failure to pay as stipulated, in either case, may be treated as an abandonment of the lease. But where, as the law stood prior to Hill Oil & Gas Co. Case and Brown v. Wilson, the lessee, in either an "unless" or an "or" surrender clause lease, had in good faith attempted to make the stipulated payment, but by accident or mistake had been prevented from doing so, the question as to whether he shall be relieved from the effects of such accident or mistake, and the transaction be treated as if the payment had been made in all respects as stipulated, when arising in this court becomes a matter of equitable cognizance, not controlled by the decisions of the highest court of this state in such matters, but to be determined by the general principles, rules, and usages of equity having uniform operation in federal courts wherever sitting as courts of equity. Guffey v. Smith, supra. The general doctrine regarding leases is thus stated in Pomeroy's Equity Jurisprudence, § 453:

"Where a lease contains an option that the lessor may re-enter and put an end to a lessee's estate, or even that the lease shall be void upon the lessee's failure to pay the rent at the time specified, it is well settled that a court of equity will relieve the lessee and set aside a forfeiture incurred by his breach of the condition, whether the lessor has or has not entered and dispossessed the tenant. This rule is based upon the notion that such condition and forfeiture are intended merely as a security for the payment of the money."

In the succeeding section it is stated that this doctrine does not apply ordinarily to forfeitures arising from other covenants in leases, but adds:

"It should be observed, however, that in all cases of this class relief may be given when the breach was the result of fraud, mistake, accident, surprise, and the like, or was acquiesced in or waived by the lessor."

But it is generally held that the doctrine announced in section 453, supra, does not apply to oil and gas leases because of the peculiar nature of those substances. In view of expressions by the Oklahoma Supreme Court regarding oil and gas leases, before the cases of Hill Oil & Gas Co. and Brown v. Wilson, I think a lessee, in either an "unless" lease or an "or" surrender clause lease, who intentionally failed to make a delay or rental payment at the time and in the manner specified in the lease, cannot invoke the general doctrine above announced as against the action of the lessor to forfeit and cancel the lease, as he might if it were an ordinary lease of lands for agricultural purposes, for instance. But where it is his intention to make the stipulated payment in strict accordance with the terms of the lease, but his attempt to do so is abortive because of some accident or mistake, not the result of his willful neglect or gross negligence, a court of equity may grant him relief as against the forfeiture asserted by the lessor because of such failure, where the lessor has not suffered in any way by the delay and it would be inequitable to enforce the forfeiture. This conclusion I believe to be fully supported by the authorities. Of course, the facts in no two cases are identical, and each case must be determined upon its own particular facts. In the numerous cases cited in briefs of counsel, none is found presenting just this case. The following are cases in which relief was denied:

Brown v. Vandergrift, 80 Pa. 142. In this case there was a delay of 11 months. The court said:

"In a case like this, equity follows the law, and will enforce a covenant of forfeiture, as essential to do justice. It is true, as generally stated, that equity abhors a forfeiture; but this is when it works a loss that is contrary to equity, not when it works equity and protects the landowner against the indifference and laches of the lessee, and prevents a great mischief, as in the case of such leases. To perpetuate an oil lease forever by the payment of a monthly sum, as here, at the will and caprice of the lessee, would work great injustice."

Hukill v. Guffey, 37 W. Va. 425, 16 S. E. 544. In this case there was a willful failure to pay rental for a period of two years.

Chapple v. K. C. Brick Co., 70 Kan. 723, 79 Pac. 666. It is strongly urged that the facts in this case are so nearly the facts in the case at bar as to very strongly support the contention that relief should not be granted here. It must be remembered, however, that this Chapple Case was an action at law, and therefore not one in which relief against mistake could be granted as in an equitable action; no such mistake having been pleaded as an equitable defense.

Witherspoon v. Staley (Tex. Civ. App.) 156 S. W. 557. In this case deposit of the rental due as stipulated in the lease was made two days late. It does not appear that an attempt was made to deposit on time which was prevented by accident or mistake.

Jennings-Heywood, etc., v. Houssiere-Latreille Oil Co., 119 La. 793, 44 South. 504. In this case payment was tendered four days late, the reason assigned being that a fire was raging in the oil field, which had absorbed lessees' attention. It appears at this time lessees were operating an adjoining tract and producing large amounts of oil, draining lessor's tract, and that they had previously promised that the next well would be opened upon lessor's tract, which had not been done.

Federal Oil & Gas. Co. v. Western Oil Co., 121 Fed. 674, 57 C. C. A. 428. In this case payment was tendered on time, but the court held lessor had the right to refuse payment even made on time, and further found the lease to be inequitable, because there was no limit of time within which, at all events, exploration must be begun.

Conkling v. Krandusky, 127 App. Div. 761, 112 N. Y. Supp. 13. This is a clear case of abandonment and an intentional failure for a long time to make the stipulated payments.

Gadbury v. Ohio, etc., Co., 162 Ind. 9, 67 N. E. 259, 62 L. R. A. 895. This is a case of abandonment for two years after drilling a well and finding gas.

Dill v. Frazee, 169 Ind. 53, 79 N. E. 971. In this case lessee intentionally failed to pay stipulated rental in advance, as the court held the contract required, on the mistaken view of the law that payment in advance was not required.

Warner v. Page (Okl.) 159 Pac. 264. In this case the Supreme Court held that the evidence failed to show that the money was in fact paid in strict accordance with the provisions of the lease, and defendant, not having sought equitable relief from the forfeiture in the trial court, was not allowed to change front and urge it in the appellate court.

Soaper v. King (Ky.) 180 S. W. 46. In this case lessee in 1902 entered into the lease, reciting a consideration of $1, and stipulated royalty of one-eighth of all oil, gas, or other mineral which might be discovered. The lease provided that the lessee should within two years, in good faith, begin to drill one or more wells upon the land, upon failure to do which the lease should be void. Within two years the lessee sunk a well over 200 feet deep, finding a vein of coal, and spent in so doing about $500. Thereafter for ten years he did nothing more.

Flannagan v. Marsh (Ky.) 105 S. W. 424. In this case the lease provided that lessee should commence drilling for oil and gas in one year or pay $25 per annum until work was commenced. They had not paid the rent for one whole year, nor all of that for the preceding year. The lease was canceled.

The reasoning in the following cases supports the granting of relief as against plaintiff's mistake: Noyes v. Anderson, 124 N. Y. 175, 26 N. E. 316, 21 Am. St. Rep. 657; Tibbetts v. Cate, 66 N. H. 550, 22 Atl. 559; Lundin v. Schoeffel, 167 Mass. 465, 45 N. E. 933; MacTier v. Osborn, 146 Mass. 399, 15 N. E. 641, 4 Am. St. Rep. 323; Bliley v. Wheeler, 5 Colo. App. 287, 38 Pac. 603; Monihon v. Wakelin, 6 Ariz. 225, 56 Pac. 735.

Neither Marks nor those whom he represented suffered in any appreciable way by the fact that for a few days this money was held by the bank for the credit of Blane, instead of Marks as agent for Blane and wife. When it is considered that, to gratify Marks, who had fallen out with the Cushing Bank, the depository provided in the lease, and without any consideration therefor, Shaffer agreed to change to the Kansas City Bank, but for which change in all probability this mistake would not have occurred, as numerous payments had been made through the Cushing Bank without mistake, and that to permit

this mistake to work a forfeiture of Shaffer's right would result in his loss of all the payments already made and the valuable rights accruing to him under the lease, the conclusion is irresistible that the equities are all in favor of Shaffer's contention, and that said payment of June 18, 1915, should be considered as having been made in all respects as his contract required. It follows that complainant's lease was in full force and effect in August, 1915, when defendant Aggers sought to acquire the interest for which he contends, and is still in full force and effect.

Decree may enter accordingly.

## NOTE.

### Oil and Gas Mining Lease.

This lease, made this 18th day of March, A. D. 1912, by and between J. H. Marks, a single man, H. L. Marks and wife, Marietta Marks, parties of the first part, and A. J. Terry, party of the second part, witnesseth: That the said party of the first part, for and in consideration of the sum of one hundred twenty ($120.00) dollars, to us in hand well and truly paid by the said party of the second part, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the party of the second part to be paid, kept and performed, has granted, demised, leased and let, and by these presents does grant, demise, lease and let, unto the said second part——, his heirs, successors or assigns, for the sole and only purpose of mining and operating for oil and gas, and the laying of pipe lines, and of building tanks, power stations and structures thereon to produce and take care of said products for the term of five years and as much longer thereafter as oil or gas is found in paying quantities, all that certain tract of land situated in the county of Creek, state of Oklahoma, described as follows, to wit: S. ½ N. E. ¼ and the N. W. ¼ of S. E. ¼ of section 33, township 17, range 7, and containing 120 acres, more or less.

In consideration of these premises said party of the second part covenants and agrees:

(1) To deliver to the credit of the first parties, their heirs or assigns, free of cost, in the pipe line to which the party of the second part may connect the well or wells, the equal one-eighth part of all oil produced and saved from the leased premises.

(2) To pay to the first parties one hundred dollars each year payable quarterly in advance for the gas from each well where gas only is found, while the same is being used off the premises, and the first party to have gas free of cost from any such well for the principal dwelling house on said land during the same time through connections made at his own risk and expense.

(3) To pay to the first party for gas produced from any oil well and used off the premises at the rate of twenty-five dollars, per year, for the time during which such gas shall be so used, said payments to be made each three months in advance.

The party of the second part agrees to commence a well on said premises within twelve months from the date hereof or thereafter pay the first parties a yearly rental of one hundred twenty dollars, payable quarterly in advance until said well is commenced, and it is agreed that the commencing and completing of such well shall be and operate as a full liquidation of all rent under this provision during the remainder of the term of this lease.

The party of the second part shall not be bound by any change in the ownership of said lands until duly notified of such change, either by notice in writing duly signed by the parties to the instrument of conveyance, or by the receipt of the original instrument of conveyance or a duly certified copy thereof.

The party of the second part shall have the right to use, free of cost, gas, oil and water produced on said land for the operations thereon except water from the wells of first party. When requested by first party the second party shall bury all pipes below plow depths on cultivated lands.

241 F.—11

No well to be drilled within less than 250 feet of the house or barn on said premises without consent of parties of the first part.

Second party shall pay.for damages caused by rigs to growing crops on said lands.

The party of the second part shall have the right at any time to remove all machinery and fixtures placed on said premises including the right to draw and remove casing.

All payments which may fall due under this lease may be made directly to the lessors or deposited to their credit in Cushing State Bank, Cushing, Okla.

The party of the second part, his heirs, successors or assigns, shall have the right at any time, on the payment of one dollar to the party of the first part, his heirs or·assigns to surrender this lease for cancellation, after which all payments and liabilities thereafter to accrue under and by virtue· of its terms shall cease and determine: Provided, this surrender clause and the option therein reserved to the lessee shall cease and become absolutely inoperative immediately and concurrently with the institution of any suit in any court of law or equity by the lessee to enforce this lease, or any of its terms, or to recover possession of the leased land or any part thereof, against or from lessor, his heirs, executors, administrators or assigns, or any other person or persons.

All covenants and agreements herein set forth between the parties hereto shall extend to 'their heirs, executors, administrators, successors or assigns.

Witness the following signatures the day and year first above written.

> J. H. Marks.
> H. L. Marks.
> Marietta Marks.
> A. J. Terry.

(Acknowledgment and filing certificates omitted.)