HOPKINS et al. v. ZEIGLER.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1919. On Rehearing, June 30, 1919.)

No. 3267.

1. LANDLORD AND TENANT ⬥44(1)—LEASE—COVENANTS—CONSTRUCTION.

A covenant that a lessee will do one thing or will do another thing may impose a binding obligation, although in the alternative, and does not necessarily import any fatally optional or unilateral character, and is not inappropriate to a lease which grants a vested interest; but a lease which does not take effect unless the lessee does a certain act is only executory, and is inoperative if the condition is not performed.

2. MINES AND MINERALS ⬥79(6)—OIL AND GAS LEASE—CONSTRUCTION.

A Kentucky oil and gas lease construed, and a provision that "second party agrees to complete a well on the premises within one year * * * unless the lessee thereafter pays a rental * * * payable quarterly in advance, until a well is completed, * * * which payments shall fully and completely extend this lease," *held* to state alternative conditions, a failure to comply with which, in view of the decisions of the highest court of the state, terminated all interest of lessee at the end of the first year.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. MINES AND MINERALS ⊜⟿81—OIL AND GAS LEASES—CONFLICTING CLAIMS.

A second lessee, who took an oil and gas lease with knowledge of a prior unrecorded lease, but which he was told by lessor had expired for failure to do development work, which was the fact, and who expended $4,000 in developing the property within three months, *held* to have not only the superior title, but equities not inferior to those of the first lessees, who through mischance failed to make a payment which would have extended their lease.

### On Rehearing.

4. COURTS ⊜⟿405(18)—REHEARING IN CIRCUIT COURT OF APPEALS—CONFLICTING DECISIONS.

That, since the rendition of an opinion by the Circuit Court of Appeals, the highest appellate court of the state, having cognizance of such opinion, has reached a contrary conclusion in another case, is not ground for a rehearing, especially where the facts involved in the state case may have presented a ground of distinction between the two cases.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit in equity by H. J. Zeigler and another against James S. Hopkins and others. Decree for complainants (258 Fed. 467), and defendants appeal. Reversed.

Mrs. Emma Hamilton was (for the purposes of this case) the owner of 50 acres of land in eastern Kentucky, in a region adjoining one where oil and gas had been found. On March 2, 1916, she signed the oil and gas lease set out in the margin.[1] The rights of Gibson, the lessee, later passed to Zeigler and

---

[1] "Agreement and lease, made and entered into the 2d day of March, A. D. 1916:

"Witnesseth, that Emma Hamilton, widow, lessor, in consideration of one dollar to us in hand duly and truly paid by W. J. Gibson, lessee, the receipt of which is hereby acknowledged, do hereby grant, demise, and let unto the lessee all the oil and gas in and under the following described tract of land; also the said tract of land for the purpose of entering upon, operating thereon, and removing therefrom said oil and gas, for the term of ten years from date, and as much longer thereafter as oil and gas is found thereon, with the right to use oil, gas, or water therefrom and all rights and privileges necessary or convenient for such operations, also the right to remove at any time all property, pipes, and improvements placed or erected in or upon said land by the lessee. Said land being all that certain tract of land situate in Willow voting precinct, —— township, Lee county, state of Kentucky, bounded on north by Ingram Rader, east by Miller Rader, south by William Rader, west by Frank Callahan, bounded and described as follows, to wit: Containing 50 acres more or less. Hereby releasing and waiving all rights of the homestead exemption law of this state. The above grant or lease was made upon the following terms:

"First. Lessee agrees to drill a well upon said premises within one year from this date, or thereafter pay to lessors rentals as hereinafter provided until a well is completed or the property hereby granted is reconveyed to lessors.

"Second. Should oil be found in paying quantities, the lessee agrees to deliver to the lessors free of charge, into tanks or pipe lines, one-eighth part or share of all crude oil produced or saved from said premises.

"Third. Should gas be found in paying quantities, the lessee agrees to pay $100 each year for the product of each well while the same is being sold off the premises. The lessor to have gas free of cost to heat and light one dwelling house during the same time at the well, to be used at the lessors' risk.

"Fourth. The lessee further agrees to bury pipe lines for oil in cultivated

Howell. They did nothing toward exploration, but on February 25—five days before the first year expired—they deposited in the post office a letter addressed to Mrs. Hamilton, at her post office address, with $1.25 to cover the so-called rental of the land in advance from March 2 to June 2, 1917. This never reached her, but was returned by the post office to them, and they deposited the same to her credit in the bank, as specified in the lease; but such deposit was not made until March 12—10 days after the year expired.

On March 7, 1917, Mrs. Hamilton gave, upon the same land, an exploration lease, the character and terms of which are in no way involved, to A. R. Putnam, who was representing himself and A. J. & J. S. Hopkins. She told him she had given a previous lease to some one, she did not know to whom, but that it was for a year, and had expired. Putnam went to the records, but did not find this previous lease. He and his associates then proceeded with exploration and development work, expended several thousand dollars and drilled three wells, the first of which was dry, but the other two of which were producing. Thereupon Zeigler and Howell made claim to the premises and filed this bill, as for waste, seeking a judicial declaration that their title and rights were paramount to those under the second lease. The District Court made a decree in accordance with the prayer of the bill, and the defendants below bring this appeal. The parties will be named as below, but "defendants" will refer to those other than Mrs. Hamilton.

A. J. Hopkins, of Chicago, Ill., and D. L. Pendleton, of Winchester, Ky., for appellants.

Le Wright Browning, of Maysville, Ky., for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). No question of record or of good faith purchase is involved, to any degree which makes it important. Before the defendants took their lease, they had actual notice of the existence of the former one. It

fields below plow depth when requested to do so, and to pay for damage done growing crops while drilling.

"Fifth. No well shall be drilled nearer than 250 feet to any building on said premises without written consent of lessors.

"[6] Second party agrees to complete a well on the premises within one year from the date hereof (unavoidable accidents and delaying excepted), unless the lessee thereafter pays a rental of 10 cents per acre, payable quarterly in advance, until a well is completed, which payments for delay in completing well may be made direct to any one of the lessors or deposited to Emma Hamilton in the Lee County Deposit Bank, Beattyville, Ky., which payments shall fully and completely extend this lease from time to time until a well is completed, and lessors agree to accept said payments of rentals when made and to mail receipts for same to the lessee.

"[7] And it is further agreed that the lessee may at any time remove all his property and reconvey the premises hereby granted which conveyance said lessors agree to accept, and thereupon this agreement shall become null and void and the payments which shall have been made, be held by the lessors as the full stipulated damages for nonfulfillment of the foregoing contract. It is agreed that all the terms and conditions hereof shall extend and apply to the heirs, executors, administrators and assigns of the parties above mentioned.

"In witness whereof, the parties have hereunto set their hands and seals this the day and year first above written. Signed, sealed and delivered in the presence of

Emma X̲ Hamilton. [Seal.]
mark

"Witness: W. V. Abney."

[The above numerals [6] and [7] are not in the contract; we insert them here for the purpose of identifying references to be made in the opinion.]

was open to them, without unreasonable effort, to learn its full terms, and the case must be considered in the same light as if a copy of it had been before them when they took their interest. The main question is sharply one of law—whether the rights of plaintiffs had expired before defendants purchased. The answer to this question obviously depends upon the character of the first instrument. If it was a lease presently granting to the lessee a vested interest, accompanied only by covenants by the lessee as to what he would do in the future, and subject to be defeated only by some efficient future forfeiture, plaintiffs must prevail, because there never was any declared forfeiture. If it was an executory contract of lease upon condition subsequent, and not creating any vested interest until the condition had happened, defendants must prevail, because the rental which should have been paid March 2 was not paid until too late.

The court below considered with great care the question in which division this instrument belonged, and classified it as a grant which would continue during its prima facie term until forfeiture. This conclusion, and the cases cited in support of it, depend largely upon the affirmative granting language in the early part. We do not doubt its correctness, as applied to many situations in which this instrument would be involved; but we cannot escape the conclusion that this paper may belong in both classes, because, in some respects, it is fairly divisible and the different parts of it logically take different aspects. There is no reason why an executory and conditional contract for a lease may not be tacked onto the foot of a lease which is a present grant—an executed contract; and while we are clear that this is a grant for a year, conveying an interest which persists during the year, unless lost by abandonment, yet we think that the character of the lessee's interest after the expiration of the first year is not necessarily the same as his interest during that year, but must be ascertained and determined as a measurably independent question.

[1] Contracts of this general character are classified according to a nomenclature which calls them "or" leases or "unless" leases. "Or" leases would be exemplified by clause first in this lease, if it were complete in itself; "unless" leases are, or may be, such as are indicated by clause (6) of this lease. A covenant that the lessee will do one thing or will do another may impose a binding obligation, although in the alternative, and does not necessarily import any fatally optional or unilateral character. It is therefore held not inappropriate to a lease which grants a vested interest;[2] but a lease which does not take effect, or which does not continue to be in effect, unless the lessee does a certain act, is only executory, and is inoperative if the condition is not performed. Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856; Lindley v. Raydure (D. C. Ky.) 239 Fed. 928, affirmed 249 Fed. 675, —— C. C. A. ——; Van Etten v. Kelly, 66 Ohio St. 605, 610; 64 N. E. 560; Glasgow v. Chartiers Co., 152 Pa. 48, 51, 25 Atl. 232; Shaffer v. Marks (D. C. Okl.) 241 Fed. 139, 151; note 44 L. R. A. (N.

[2] We recently had occasion to apply the same principle to a Kentucky contract involving a municipal franchise. Ashland Waterworks Co. v. City of Ashland, 251 Fed. 492, 163 C. C. A. 486.

S.) 50. The execution of a second lease is, in such case, a sufficient avoidance of the first. Thornton's Oil & Gas (3d Ed.) §§ 192, 193.

[2] We are thus brought directly to the question, as the one immediately controlling, whether, considering both clause first and clause (6) any ambiguity results, and, if so, which shall be allowed to give character to the instrument. We think these clauses, set over against each other, do create an ambiguity. It is true enough that, if clause first is considered by itself and given full and complete interpretative effect, as if clause (6) were not present, we can say that there is nothing in clause (6) necessarily inconsistent with this effect, because we thereby, more or less unconsciously, assume that the first is dominant, and that any seeming inconsistencies in the other should be eliminated, if possible; but the converse is equally true. If we consider (6) by itself, and give to it its full natural scope, we can construe away any prima facie inconsistency found in the first. To determine whether there is ambiguity in the whole contract, these two clauses must be considered simultaneously, without first assuming that either one is entitled to dominance.

We cannot take the presence of the word "unless," in (6), as alone a sufficient indication of an "unless" lease. It modifies the immediately preceding provision that a well shall be completed within a year, and the vital question is whether this provision is a covenant or a condition; if the former, then the word indicates only a contingent extension of the time for performance; if the latter, then the rights of the lessee terminated at the end of the year, "unless," etc. The more important part of this clause is found in the later words, "which payments shall fully and completely extend this lease from time to time until the well is completed." These words distinctly imply that the lease would not be extended if the payments were not made, and hence tend to show an understanding and intent that, lacking payment, the rights under the lease would terminate at the end of the specified time. It is obvious that if the lease were not to be about to come to an end, there would be no occasion for doing anything to "extend" it.

The only reason suggested why these words do not justify this inference is that, when the parties said "extend this lease," they meant "extend the time for drilling." The reason for this interpretation is not compelling. Plaintiffs have insisted that, because the document used the language of a lease in its early part, it was a lease and not a license. There is no reason to doubt that the language of (6) was chosen as intelligently and carefully as the earlier language. Indeed, from an application of all the aids to interpretation hereafter mentioned, it seems highly probable that the parties chose their word correctly, and that they had in mind an extension, not of some provision of the lease, but of the lease itself, with everything appurtenant. We observe, also, that these payments had already been given function as the price of delay in drilling, and there was no occasion to say that they should extend the lease, unless it was intended that they should have a further and greater effect. The language is:

"Which payments for delay in completing well * * * shall fully and completely extend this lease."

Concluding, therefore, as we do, that clause first by itself tends to show an absolute obligation to pay rent after the year if the well is not completed, and that clause (6) tends to show an optional right to pay rent quarterly in advance as a condition of getting the lease extended from the certain first year to the contingent further years, it must be considered which one imparts its own character to the lease. Upon this subject, we first observe that clause first is not complete in itself, but refers to clause (6). The alternative covenant, if it be rightly called a covenant, is not to pay rentals there stated, but to pay rentals "as hereinafter provided." If in truth the rentals provided for in (6) are conditional, and not obligatory, then there remains nothing obligatory about the rentals specified in clause first, because they are the same. They come into the first from their home in (6), and they bring their character with them.

Upon the same subject, we next observe that clause first is general; clause (6) particular. Everything said in the first is repeated and amplified in (6). The provision that a well shall be drilled within the year is repeated with slightly varying words, but the difference between "drill" and "complete" does not seem intended to be substantial. The provision in (6) covering a case of unavoidable delay or accident is an addition, but there could be no hesitation in giving it effect merely because it was not found in the first. The provisions as to time, manner, and amount of payment are amplifications of clause first, if that can be said of provisions which are by express reference present in the first. The provisions as to the effect of the payments to extend the lease declare the result of those same payments which are referred to in clause first.

These two facts—that the character of the rentals specified in the first can only be ascertained by reference to (6) and that (6), in particular and in detail, repeats and covers the subject mentioned more generally in the first—go far to persuade that the earlier must yield to the later in so far as there may be prima facie inconsistency; but other pertinent considerations tend in the same direction.

It is urged that the grant is not stated to be upon any conditions; the lessee's numbered covenants, 1 to 5, inclusive, being introduced by the denomination, "terms." The mere use or nonuse of the word "conditions" could not be very controlling; but on precise and careful application of language, whatever inference may be drawn therefrom is in favor of defendant's position. The last paragraph refers to "all the terms and conditions hereof." The numbered covenants which have been introduced by the word "terms" end with 5. If, indeed, these are terms in the strictest sense, so that they cannot be called conditions, then, when the last paragraph speaks of conditions, it must refer to something else, and thus it can only refer to (6) and (7).

Mrs. Hamilton could not read or write. The agent of the lessee prepared this lease, took it to her, explained it to her, and she signed it. Under the familiar rule, all doubts and ambiguities would be solved against the lessee. Leases of this character contemplate prompt development. No express provision for forfeiture in case nothing is done is included herein. A prompt and speedy right to have some one

else explore and develop if the first lessee does not is vital to the lessor. In Kentucky, courts have worked out a rule by which, even where there is a full lease with covenants and no forfeiture clause, the lessor has a measure of protection through proceedings to forfeit, if, after notice, the lessee will not proceed with drilling (Monarch Co. v. Richardson, 124 Ky. 602, 99 S. W. 668; Warren Co. v. Gilliam, 182 Ky. 807 (207 S. W. 698); but this is an imperfect remedy involving delay and litigation, and only indirectly and by inclusion does it reach nonpayment of rentals. Its existence does not detract much from the very natural presumption that if a contract, which may be intended as an executed lease with covenants, or as an executory lease upon conditions, omits any clause of forfeiture, the omission was because it was thought not necessary, and that it was thought unnecessary because the lessee's rights were supposed to terminate at the end of the stated period unless the extension condition was performed. Certainly Mrs. Hamilton, if well advised, would not have intended to sign a lease where she had no way of terminating it for nonpayment except by litigating the question of reasonable notice, when she could just as well put the burden of continuing it upon the other side; and the same presumption ought to prevail when all her advice came from the other party. We should suppose that a due regard for the public policy of Kentucky, as evidenced by the Monarch and Warren Cases, requires that, when the year has expired and the lessee has done nothing, the future interest of the lessee should not be treated as vested unless the language of the lease imperatively so requires. See Chaurenet v. Pearson, 217 Pa. 464, 66 Atl. 855, 11 L. R. A. (N. S.) 417.

In addition to all this, it appears without dispute that when she signed the lease she was told by the lessee's agent that it was only for a year, and would be null and void at the end of that time if a well was not drilled, unless the renewal rent was paid in advance, and that no notice of any claim to the contrary came to her until after she had leased to the defendants. True, this agent read the lease to her; but he knew that she was an ignorant woman, wholly unfamiliar with such matters, and could neither read nor write, and that she would rely upon his explanation of what these strange and unfamiliar words meant rather than rely upon herself to understand as she heard him read them. With such a history of the transaction, to sustain the present contention of plaintiffs would be to permit the representations made to her to accomplish fraud and deceit. Surely, if the written words used are fairly capable of an interpretation by which, as the facts have now developed, they bring about the same result as if the representation had been true, the law should give them that construction, rather than one wholly subversive of the admitted intent.

This paper must be construed according to its peculiar and, we think, unique language. Upon the critical point, we get no satisfactory help from any of the cases cited; but as the result of all the considerations recited, we conclude that the promise to complete the well within the year should be treated as a condition, upon breach of which the rights of the lessees would terminate unless a future rental was paid as specified.

The attempt to pay by mail was insufficient. The contract did not provide for such payment; to say the most, it only hints at it by its provision that a receipt for the payment shall be mailed; and there is no sufficient evidence of a general custom for such payment, of which Mrs. Hamilton had knowledge or should be presumed to have knowledge.

[3] The final position of plaintiffs is that since they endeavored to make payment promptly, and failed to do so only because of a mischance, equity should relieve them from the resulting hardship. We cannot regard plaintiffs' equities as so superior to those of defendants as to justify this result. Defendants purchased with knowledge of the former lease, but Mrs. Hamilton told them it had expired, they believed that it had, and we find that it had. Neither Mrs. Hamilton nor the other defendants knew that plaintiffs had made any attempt to pay. Apparently this attempt was first heard of, by her or by them, when this bill was filed. When the second lessees took their lease, their optional period was only three months; they actually intended to proceed promptly, and they did; within three months they had expended over $4,000 on the property and had developed it successfully. Plaintiffs, seemingly, never intended to do anything except to speculate. Neither they nor their assignors ever went upon the premises during the first year, or, so far as the record shows, went into the vicinity or engaged in any kind of exploration which would affect this property. While they notified defendants that they held the first lease and intended to enforce it, they did not give notice that they had made the required payment and thus kept it alive, nor did they otherwise make protest or claim, but stood by silently while defendants were expending their money improving the property.

The categorical testimony of plaintiff's agent that for nearly three months he did not know of this drilling and actual oil discovery being carried on by the defendants upon this and adjoining properties need not be doubted; but the claim that both of plaintiffs and those representing them neither knew nor were chargeable with knowledge of such important developments in a region where they were interested and about 10 miles from where they kept their principal office, is not very credible. True, they had a legal right to take a speculative lease, and reap if others sowed; but if they suffer legal disaster in their harvest, a court of equity will not be anxious to help them out. The prayer of Mrs. Hamilton that the first lease be set aside because of the fraud practiced on her by misrepresenting its purport (if its purport be as now claimed) is at least as appealing as plaintiffs' request to be saved from a loss of their profits.

We think that the legal title of defendants is superior, and their equities not less. It follows that they are entitled to a decree upon their cross-petition, and the decree below must be reversed, and the case be remanded for that purpose.

## On Rehearing.

[4] Upon consideration of the petition of the appellee for rehearing, it appears that, after the submission of this case to this court and

immediately before its decision, an opinion was announced by the Kentucky Court of Appeals in Ohio Valley Oil & Gas Co. v. Irvine Development Co. (May 2, 1919) 212 S. W. 110, which opinion is said to announce a rule inconsistent with the result reached by this court in this case, and that the Kentucky Court of Appeals has denied a rehearing in that case after our opinion in this case was brought to its attention. It further appears that the opinion of the Kentucky Court of Appeals may well be thought to rest essentially upon facts sufficient to distinguish that case from this, and that the rehearing may well have been denied, in whole or in part, for this reason.

It further appears that in any event at the time this controversy arose and this case was submitted to this court, there was no fixed and settled rule of law in Kentucky declared by its court of last resort and inconsistent with our opinion.

Thereupon the appellee's petition for rehearing in this cause is denied.