# DOW et al. v. WORLEY.

No. 16502.   Opinion Filed May 11, 1926.

Rehearing Denied April 12, 1927.

## 1. Oil and Gas—Leases—Time for Development—Effect of Confirmatory Leases.

H. secured an oil and gas lease from W.. the owner of the fee of two tracts of land in the same section, and lying contiguous to each other and embracing 200 acres of land. By mesne assignments, S. became the owner of the lease on 160 acres of the land, and D. became the owner of the lease on 40 acres of the land, but there was an agreement between S. and D. whereby, in consideration of the drilling of a well by D., he, D.. was to have an interest in the 160-acre tract lease. It was discovered the notary public taking the acknowledgment to the lease recited that it was taken in O. county by a notary for H. county, and new leases were

executed covering the 160-acre tract and the 40-acre tract, in confirmation of the original lease, and to correct the error in the acknowledgment, but by reason of W. having conveyed certain interests in a portion of the 200-acre tract to F. and G., it was necessary to execute two confirmatory leases, one by F. and G. to S. and one by W. to D., both confirmatory leases containing the same conditions and expiration dates as the original 200-acre tract lease. The original lease was never released or abandoned. Held, the commencement of drilling operations on any portion of the 200-acre tract within the time provided for in the lease and the production of oil or gas in paying quantities upon any portion of the 200-acre tract is sufficient to continue the original and confirmatory leases in full force and effect, as long as oil or gas is produced in paying quantities, as provided in the leases.

## 2. Abandonment—Requisites for Abandonment of Property.

To constitute abandonment in respect of property, there must be a concurrence of the intention to abandon, and an actual relinquishment of the property. so that it may be appropriated by the next comer. In determining whether one has abandoned his property rights, the intention is the first and paramount object of inquiry, for there can be no abandonment without the intention to abandon.

## 3. Notice—Facts Putting Upon Inquiry.

Whatever is notice enough to excite attention and put a reasonably prudent person on his guard and calls for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant with it.

## 4. Equity—Maxims—"Clean Hands."

One of the most salutary principles of equity jurisprudence is expressed by the maxims, "He who comes into equity, must come with clean hands," and, "He who has done iniquity cannot have equity."

A court of equity acts only as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then. whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be remediless in a court of equity.

(Syllabus by Ruth, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Okfuskee County; John L. Norman, Judge.

Action by G. E. Morriss against J. E. Dow, J. M. Ferrall, Richard Ferrall Lyle Ferrall. George Ferrall, and the Mid-West & Gulf Oil Corporation, wherein plaintiff seeks

to be decreed the owner of a three-fourths interest in an oil and gas leasehold estate. H. F. Worley intervenes, claiming the remaining one-fourth interest. Judgment for plaintiff and intervener, and defendants appeal. Reversed and remanded, with directions.

Ramsey, de Meules & Martin and Rogers & Jones, for plaintiffs in error.

Humphrey & Campbell, for defendant in error.

Opinion by RUTH, C. As disclosed by the record, on August 6, 1919. C. O. Wilson, being the owner of certain lands in Okfuskee county, executed an oil and gas lease to one B. H. Harrison, covering the southeast quarter of sec. 33, twp. 10 north, range 9 east, and the northeast quarter of the southwest quarter of section 33, twp. 10 north, R. 9 E.; the lands being in contiguity and contained in the one lease. The S. E. ¼ contained 160 acres and the N. E. ¼ of the S. E. ¼ contained 40 acres, making 200 acres in all.

By various mesne assignments, the Sands Petroleum Company and George C. Lockwood became vested with this oil and gas mining lease in so far as it covered the 160-acre tract, and one J. E. Dow became vested with the lease in so far as it covered the 40-acre tract.

The Sands Petroleum Company and Lockwood agreed to assign to Dow an undivided one-half interest in the 160-acre lease, in consideration of Dow drilling a well and performing certain other work. Dow thereupon entered into a contract with the Mid-West & Gulf Oil Corporation and J. M. Ferrall & Sons for the drilling of this well, and Dow agreed to assign them certain interests in both the tracts. It appears that one E. Rogers Kemp, in his lifetime, had some interest in the lease covering the 40-acre tract, but after his death, a settlement was made and all the interest in the 40-acre tract vested in Dow.

The Mid-West & Gulf Oil Corporation, after entering into its contract with Dow, caused the title to be examined, and it was disclosed that the lease executed by Wilson and wife in 1919, to Harrison, contained an irregularity, in this, that though the lease purported to have been acknowledged in Okfuskee county, it bore the seal of a Hughes county notary public. G. E. Morriss, the plaintiff in this action, was the notary public taking such acknowledgment, and he at-

tempted to cure the defect by filing an affidavit setting forth the fact that the acknowledgment had in fact been taken in Hughes county. This did not prove satisfactory to the parties interested, as the original lease to Harrison had been lost or destroyed, and the notary could not affix a new certificate thereto.

On November 19, 1919, about three months after the execution of the original lease to Harrison, or in November, 1919, C. O. Wilson and wife conveyed to W. C. Farmer and X. X. McGee the entire fee to the 160-acre tract and all the fee to the 40-acre tract, except that C. O. Wilson reserved to himself the oil and gas mining rights therein. To cure this defect in title it was necessary to have a new lease executed, but by reason of the changing and shifting of title it was impossible to obtain a single lease covering the 200 acres.

On April 11, 1923, Farmer and McGee executed a new oil and gas mining lease to the Sands Petroleum Company and George C. Lockwood covering the 160-acre tract. This lease contained the same terms as the Wilson to Harrison lease, executed in 1919, and was to continue until the 6th day of August, 1924, and as long thereafter as oil or gas is produced.

On April 11, 1923, Wilson and his wife executed an oil and gas mining lease to J. E. Dow, and this lease contained the same terms and conditions, and was to expire on the same day the Harrison lease of 1919 was to expire, but this lease was for the 40-acre tract. It appears that McGee claiming to represent Dow, was instrumental in getting C. O. Wilson and his wife to execute this lease to Dow. This would appear to have placed the parties in the original positions they held under the Harrison lease of 1919.

G. E. Morriss, this plaintiff, was the notary public who took the acknowledgment of the Wilsons to the Harrison lease in 1919, covering the 200-acre tract, and also took the acknowledgment of the Wilson to the Dow lease of April 11, 1923, covering the 40-acre tract, so he, of course, knew of the existence of these leases; however, on June 16, 1924, C. O. Wilson and wife, then being in Las Cruces, N. Mex., executed a lease to this Morriss, conveying to him a three-fourths interest in the oil and gas mining right in the 40-acre tract, and Morriss caused this lease to be recorded June 23, 1924. This lease recited a consideration of "one dollar and other g. & v. c. cash in hand paid," etc.

On August 7, 1924, Morriss caused the following notice to be served:

"State of Oklahoma
ss.                    Notice.
County of Hughes,

"Please take notice that I am the owner of an oil and gas lease on the following described land, situated and being in Okfuskee county, Okla., said oil and gas lease being recorded in the office of county clerk, Okfuskee county, Okla., on the 23rd day of June, 1924, in book B-65, at page 618, which said lease covers the following land, to wit: The northeast quarter of the southwest quarter of section 33, township 10 north, range 9 east. From the examination of the records, you seem to be the owner of an oil and gas lease on said land that expired at midnight August 7, 1924, at which time my lease takes effect.

"This is to advise you that I will hold you to strict accountability to any damage done to my lease by reason of the drilling of a well or the continuance of the drilling of a well on said land, as I do not recognize that you have any interest in said lease after midnight August 6, 1924, but under your lease, you have the right to move your tools, which I will gladly give you permission to do.

"Take due notice thereof and govern yourself accordingly. G. E. Morriss, Owner of Lease."

Indorsed on back:

"The original of this notice was served at 9:05 a. m. o'clock, August 7, 1924, in the presence of J. C. Laport, H. L. Rogers, and J. A. Grotts, who further certify that the well that was being drilled by the Midwest & Gulf Oil Corporation was neither producing oil or gas at the time the original notice was served.

"J. C. Laport.
"H. L. Rogers.
"J. A. Grotts.

"This notice served on Mr. J. J. Yaden, who represented himself to be the lease foreman for the Midwest Oil Company, and also served on Mr. Irvin, who represented himself to be the drilling contractor, both advised that well was 1,860 feet deep and no oil or gas showing. Well was drilling."

On April 26, 1924, C. O. Wilson and wife, then being in Las Cruces, N. Mex., executed a lease of a one-fourth interest in the oil and gas mining rights in the 40-acre tract to the intervener, W. H. Worley. This lease recited a consideration of "one dollar and other good and valuable considerations, but this lease contained the following exception:

"Except an oil and gas leasehold estate hereinafter referred to, which is recorded in the office of the county clerk of Okfuskee county, Okla."

As the lease from Wilson to Morriss was not executed until June 16, 1924, and recorded on June 23, 1924, the only leases of record covering this land at the time of the execution of the Worley lease, was the Harrison lease of 1919 and the Dow lease of April 11, 1923, and Worley cannot be heard to say that he did not know of the existence of these leases.

It appears this action was filed October 28, 1924, at which time the well being drilled by the defendants on this land had reached a depth of 3,342 feet. A temporary order was prayed and issued restraining defendants from further operations, but nature, not being included in the restraining order, took the matter into its own hands, and in less than one month the well blew itself in, and commenced producing oil in paying quantities before the day set for hearing on the injunction, and the temporary order was dissolved.

The defendants' answer, after setting up the greater portion of the statements hereinbefore contained, alleged that at the time of executing the 1923 leases, it was understood and agreed by all the parties thereto, that the two instruments were in ratification and confirmation of the original oil and gas lease, and for the sole purpose of enabling the lessees to evidence their rights to the oil or gas in, on, or under the entire 200 acres covered by the original lease, and that they never released, agreed to release, or intended to release any of their rights under the original lease, and that they never abandoned, agreed to abandon, or intended to abandon any of their rights under the original 200-acre lease, but that it was the intention, agreement, and understanding of all the parties, that the original lease should remain in full force and effect.

On March 5, 1923, defendants entered into a contract with J. M. Ferrall & Sons, for the drilling of a well on the 200-acre tract. The drilling was started in March, 1923, and gas in paying quantities was produced in June, 1923, and defendants insist they are entitled to all the oil and gas produced or possible of production from the 200-acre tract. It further appears that in June, 1924, defendants commenced to drill another well at another location on the 200-acre tract, this well, in fact, being on the N. E. ¼ of the S. W. ¼, sec. 33, being the property in dispute.

It is not controverted that defendants pros-

ecuted the drilling of this well from June, 1924, until October, 1924, when they were restrained by order of the court, but having reached the top of the oil sand at this time, the well blew itself in, as before stated.

No replies appear to have been filed to defendants' answer, and the cause proceeded to trial upon the petition of Morriss, the petition of intervention of Worley, and the answer of defendants.

Upon trial had to the court, judgment was rendered in favor of plaintiff and intervener, and defendants appeal, and as the issues have been determined as between plaintiff and defendants, the only question to be determined by this court is that raised by the plea of intervention, wherein H. F. Worley claims one-fourth interest in and to the oil and gas leasehold of the 40-acre tract under his lease executed by C. O. Wilson and wife on April 26, 1924.

The intervener in his petition of intervention recognizes the validity of the J. E. Dow lease from C. O. Wilson and wife, executed on April 11, 1923, up to a certain date, and sets forth some of the provisions of the Dow lease as follows:

"Term: Ending August 6, 1924, and as long thereafter as oil or gas is produced from said land by the lessee. •

"If no well is commenced on said land on or before the 6th day of August, 1923, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor or to the lessor's credit in the American National Bank, at Wetumka, Okla., the sum of $40, which shall operate as a rental and cover the privilege of deferring the commencement of a well for 12 months from said date. In like manner and upon like payments or tenders, the commencement of a well may be further deferred for like periods of the same months successively."

Intervener alleges that no oil or gas was discovered upon said land on or prior to August 6, 1924, and no well was commenced upon said land prior to August 6, 1923, and the lessee nor anyone for him paid or tendered the rentals provided for in the lease to Dow, and therefore all the rights of Dow have terminated.

The intervener joined the plaintiff in praying the defendants be enjoined from further drilling, alleging the well was now drilled to the top of the oil sand, and he was afraid if it penetrated the sand and it proved to be a dry hole, he could not sell his interest, but that if it was not drilled into the sand he estimated his one-fourth interest to be of a value of $50,000. It is very evident

this intervener never intended to develop the property, but simply to speculate with it, had not the forces of nature asserted themselves and dissolved the injunction by blowing in the well.

We are in this appeal confronted with the following propositions:

If the rentals were paid, or, if a well was commenced on the land prior to August 6, 1923, or, if oil or gas was discovered on the land prior to August 6, 1924, the trial court erred in rendering judgment for the intervener.

C. O. Wilson testified on direct examination, and in response to the question—

"Did the defendant J. E. Dow, or anyone for him, ever deposit to your credit in the American National Bank at Wetumka, $40 rentals provided for in that lease so far as you know?" Answered: "No, sir."

On cross-examination, however, he states that he does not know whether he ever inquired at the American National Bank about these rental deposits, but he always got his statements from the bank, but he did collect rentals for 1922.

It appears one E. Rogers Kemp, as before mentioned, had an interest in this particular 40-acre tract, and we gather from the record Kemp was the man who was furnishing J. E. Dow the money with which to operate, and the defendants introduced the following exhibits fully identified:

"Exhibit 3.

"Wetumka, Okla. April 28, 1923.
"Mr. C. O. Wilson:

"Dear Sir: In checking over the rentals paid for credit to your account at the American National Bank at Wetumka, it has been found that the rental on the N. E. ¼ of the S. W. ¼ of 33-10-9, containing 40 acres, has been paid twice. One credit being made on May 15, 1922, by S. S. Reesman, and the other credit being made by this company as the executor of the estate of E. R. Kemp, deceased, on August 5, 1922. This being the case, it is requested that you kindly sign the enclosed receipt to cover the rental on the above described tract from August 6, 1923, to August 6, 1924. This being necessary to complete our files and to adjust the duplication of the 1923 payment. Thanking you in advance for the above favor and trusting you will return the receipt promptly in the addressed envelope enclosed, I am, Yours very truly, Exchange Trust Company, Executor of the Estate of E. R. Kemp, Deceased.
"F. C. H. Encl.
"C.-R. G. J."

"By _____."

It appears G. E. Morriss, the plaintiff

herein, was the assistant cashier of the American National Bank at Wetumka, and knew that E. D. Hall was the cashier, and was acquainted with the signature of E. D. Hall, and Morriss identified the following duplicate deposit slips, offered in evidence by defendants:

"Exhibit One.

"Deposited with American National Bank for the credit of C. O. Wilson. Wetumka 5-13-1922.

"Currency—Silver—Gold—Checks as Follows:

"S. S. Reesman $40 oil & gas rental on N. E. ¼ S. W. ¼ sec. 33-10-9 in Okfuskee county, Okla., to 8-6-1923—$40 not negotiable. Duplicate deposit ticket received by E. F. Hall.

"Exhibit Two.

"Deposited with American National Bank for the credit of C. O. and Bonnie Wilson. Wetumka, Okla. 8-5-1922.

"Currency—Silver—Gold—Checks as Follows: No. 10367

"Exchange Trust Co. Tulsa $40 executor estate of E. R. Kemp, rental on N. E. ¼, S. W. ¼ sec. 33-10-9 to 8-6-1923—$40. Not negotiable. Duplicate deposit ticket received by E. F. Hall."

It must be conceded, then, that the rentals were paid up until August 6, 1924, at which time the defendants had a well 1,860 ft. deep on this particular 40-acre tract, and a well on the 160-acre tract had been producing for more than one year, and these two tracts comprised the original 200-acre tract lease of B. H. Harrison executed August 6, 1919, which lease was still of record and not released, and it must further be conceded that if the later leases had not been executed, and this condition existed under the Harrison lease, there could be no controversy over the rights of these defendants, as the Harrison lease, as well as the subsequent leases, provided for their continuance so long as oil or gas was produced.

Intervener contends that by accepting the subsequent leases, defendants abandoned the original lease, or that the original lease was superseded and supplanted by the two subsequently executed leases, but to constitute abandonment there must be an **intention** to abandon, and an actual relinquishment of the property. The rule is laid down in 1 Cyc. 4 5, as follows:

"To constitute abandonment in respect of property, there must be a concurrence of the intention to abandon, and an actual relinquishment of the property, so that it may be appropriated by the next comer. In determining whether one has abandoned his property rights, the intention is the first and paramount object of inquiry; for there can be no abandonment without the intention to abandon." See Lowther Oil Co. v. Miller-Sibley Oil Co., 54 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027.

In Thornton on Oil & Gas, sec. 155, vol. 1 (3rd Ed.), it is said:

"The distinction between an abandonment and a forfeiture is often so thin as not to be distinguishable, and yet, broadly speaking, there is a difference, which may in a measure be stated thus: An abandonment rests upon the intention of the lessee to relinquish the premises, and is therefore a question of fact for the jury; while a forfeiture does not rest upon an intent to release the premises, but is an enforced release."

In the instant case the evidence of the defendants is directly opposed to the theory of abandonment of the original lease; but that they at all times recognized and considered the original lease as in full force and effect, and it is conceded the original has never been released.

There was evidence on the part of the plaintiff to the effect that McGee said, when getting the Dow lease, that the old lease would be released, but this is denied by McGee, and Dow testifies positively that McGee had no authority to make such a statement if he did make it. An effort was made to have McGee testify that all he did in the transaction, was done by him as agent for Dow, but as far as intervener could get McGee to go along this line, upon a very persistent cross-examination, was to say:

"I don't know whether I would be considered an agent or not; I was very much interested in getting the lease fixed up; about as much interested as they were."

McGee's interest is obvious. Farmer and McGee were the owners of the fee of all of the 200 acres, and it is but natural he would put forth every effort, from a standpoint of purely personal interest, to have the matter closed, to the end that drilling might proceed, and production had, if possible. and we are of opinion that the effort to prove agency on the part of McGee, with power to bind Dow to release his rights under the original Harrison lease, wholly failed; and, furthermore, McGee testified he made no such statement, and Dow and the president of the Midwest & Gulf Oil Corporation testified they had no intention of abandoning the original lease, and this testimony was competent.

In Blackwell Oil & Gas Co. et al. v. Whit-

ed, 81 Okla. 45, 196 Pac. 688, this court said:

"The officers of the defendant testified they had no intention of abandoning the premises. This testimony was competent. In Association v. Hetzel, 103 Pa. St. 507, it was said: 'Under the rule admitting parties to testify in their own behalf, where the character of the transaction depends upon the intent of the party, it is competent for him to testify what his intention was.'"

Intervener cites Papoose Oil Co. v. Swindler, 95 Okla. 264, 221 Pac. 506, in support of his contention that where a new lease is made during the life of a subsisting lease, it operates as a surrender of the first lease, and while the syllabus of the cited case might lead one to such a conclusion, and while this may be true as a general proposition, a careful examination of the opinion wholly fails to sustain the point contended for. In that case the court's closest expression on that point is as follows:

"It is not necessary to enter into a discussion of the question as to whether the agreements would be valid if they were to commence when the minors reached their majority, because our view of the case is that the extension agreement had the same effect as a new lease carrying forward the old lease so modified by the extension agreement and with immediate possession."

If it was but the carrying forward of the old lease, it was in no wise a surrender of the old lease, and in the instant case it was distinctly understood and agreed that the new leases were but confirmation of the Harrison lease of 1919, and to make the correction or supply the deficiency.

In the cited case all the terms of the lease were changed, while in the instant case the termination of the lease and all other conditions were identical with the original lease, and even so, in the case relied upon by intervener, the judgment of the trial court in favor of plaintiff was by this court reversed and remanded, with directions to enter judgment for defendant, the Papoose Oil Company. The case therefore is not authoritative under the facts in the instant case, and is not persuasive upon the court.

The next proposition presented is, that intervener is estopped to question the validity of the oil and gas mining rights owned by the defendants. The intervener's lease contained the following:

"It is hereby expressly declared that, whereas, the land particularly described in this conveyance is understood to be subject to an oil and gas mining lease in favor of _____, it is intended that said outstanding lease is fully embraced in the general terms of this conveyance so as to pass to, and vest in, the said H. F. Worley, a fourth interest not only in the oil and gas, but also all rents and royalties therein reserved for the lessor, precisely as if such H. F. Worley had been on the date of the making of said lease the owner in fee of a fourth interest in and, to the lands described and himself one of the lessors therein."

It nowhere appears the lessor, C. O. Wilson, considered the defendants' leases forfeited, as they were clearly recognized and mentioned in the intervener's lease, and intervener had knowledge of the fact that defendants were operating under the original Harrison lease and the leases of 1923 taken in confirmation thereof, yet intervener was content to send off to New Mexico and have a lease executed on this 40 acres, more than four months before the expiration of defendants' lease, had no well been started nor the rentals paid. Intervener could and should have known that there was a producing well on a portion of the 200-acre tract covered by the original lease when he took his lease on a portion thereof, and he stood idly by after obtaining his lease until defendants had drilled a well to a depth of 3,342 feet, and so far into the oil sand that it blew itself in while the injunction was pending.

In Thomas v. Huddleston, 65 Okla. 177, 164 Pac. 106, this court said:

"Whatever is notice enough to excite attention and put a reasonably prudent person on his guard, and calls for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." See Daniel v. Tolon, 53 Okla. 677, 157 Pac. 756.

In view of all the evidence contained in the record, we are constrained to hold that the leases of 1923 were but leases in confirmation of, and to supply the deficiency, if any, in the Harrison lease of 1919, and the validity of this lease is not attacked, and defendants had the right to proceed to drill or operate under the Harrison lease and the assignments thereof, which they claim they were doing, and if there was a defect in the acknowledgment, this was a matter that could have been taken advantage of, if at all, by the original lessor, Wilson, or the owners of the fee, to wit, Farmer & McGee.

Intervener appears to have acquired this lease not alone for the purpose of speculating upon its value in an undeveloped state,

вut it would appear he was also speculating upon the ultimate and final action of the courts, which cannot be countenanced.

In Bearman v. Dux Oil & Gas Co., 64 Okla. 147, 166 Pac. 199, this court quotes with approval Michigan Pipe Co. v. Freemont, etc., 111 Fed. 284, 49, C. C. A. 324, wherein Judge Sanborn said:

"A court of equity is the forum of conscience. Nothing but good faith, the obligations of duty, and reasonable diligence, will move it to action. Its decree is the exercise of discretion, not of an arbitrary and fickle will, but of a wise judicial discretion, controlled and guided by the established rules and principles of equity jurisprudence. One of the most salutary of these principles is expressed by the maxims, 'He who comes into a court of equity must come with clean hands,' and, 'He who has done iniquity cannot have equity.' A court of equity will leave to his remedy at law—will refuse to interfe e to grant relief to—one who, in the matter or transactions concerning which he seeks its aid, has been wanting in good faith, honesty or righteous dealing. While in a proper case it acts upon the conscience of a defendant, to compel him to do that which is just and right, it repels from its precincts remediless the complainant who has been guilty of bad faith, fraud, or any unconscionable act in the transaction which forms the basis of his suit.'

"In Deweese v. Reinhard, 165 U. S. 286, 17 Sup. Ct. 340, 41 L. Ed. 757, Mr. Justice Brewer, speaking for the court, said: 'A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.'

"In Eaton on Equity, p. 74, it is said: 'Equity will refuse its aid in the enforcement of a contract where the plaintiff has practiced fraud on the defendant, and also where the plaintiff has been guilty of any unconscionable conduct which does not a-mount to legal fraud.'

"In Pomeroy, Equity Jurisprudence, sec. 398, the rule is stated thus: 'It is not a-. lone fraud or illegality which will prevent a suitor from entering a court of equity; and really unconscionable conduct connected with the controversy to which he is a party will repel him from the forum whose very foundation is good conscience'."

It is contended. and we think equity and good conscience sustain the contention, that the defendants, having commenced a well upon the 40-acre tract within the period for which the rentals had been paid, were entitled to complete the same with reasonable diligence, and, when upon completion, production was found in paying quantities the said oil and gas mining lease would continue for as long as oil or gas is produced.

Even though it were admitted, which it is distinctly denied, that defendants' rights were predicated upon the lease of 1923, under the rule announced in Leste. v. Mid-South Oil Co., 296 Fed. 661, defendants would be entitled to recovery. In that case, the oil and gas mining lease was what is known as a "commencement" lease. It was for a term of five years and as long thereafter as oil or gas is produced from said lands by the lessee. The lease was dated April 9, 1917, and the rentals having been fully paid, the assignee, over the lessors' protest, began a well on April 8, 1922, which was completed, and gas found about April 22, 1922, and it was there contended (as it is in the instant case), that the lease had expired on April 8, 1922, for the reason that no production had been obtained. Judge Knappen. speaking for the court, said:

"Had the term clause stood alone—that is to say, if the development clause were to be ignored—the lease would expire in five years from its date, unless oil or gas was actually produced within that time. Guffey v. Smith, 237 U. S. 101, 116, 35 Sup. Ct. 526. 59 L. Ed. 856; Union Gas & Oil Co. v. Adkins (C. C. A.) 278 Fed. 854, 856, and cases there cited. But the term clause did not stand alone. The provision in the development clause, that.the lease should terminate 'if no well be commenced' on or before April 8, 1918—considered in connection with the 'unless' clause, and in view of the payments thereunder—means, as applied to the facts of this case, that the lease should terminate unless a well be commenced on or before April 8, 1922. As respects the time the lease should terminate, the development clause was thus on its face inconsistent with the term clause, so creating an ambiguity between the two clauses. In these circumstances, a question of intent arises. Neither clause can primarily be assumed to dominate the other; neither can primarily be ignored. Both must be .considered together, and effect given to each. Hopkins v. Zeigler (C. C. A. 6) 259 Fed. 43, 47, 170 C. C. A. 43.

"It is impossible, in the judgment of a majority of the court, to give effect to the development clause, or to harmonize it with the term clause, except by interpreting it as so modifying the term clause as to make the lease terminate unless the lessee should. on or before April 8. 1922, have completed a well then producing oil or gas—in which case the lease should further continue so

long as oil or gas should be produced—or unless the lessee should, on or before the end of April 8, 1922, in good faith commence a well, and by reasonable diligence and dispatch complete it as a producing well in paying quantities, in which latter case, also, the lease should continue so long as such production continued. This construction does not make the term clause yield to the development clause, but gives due force and effect to each. Under that clause appellee had the entire of that day to commence a well. Ringle v. Quigg, 74 Kan. 581, 591, 87 Pac. 724; Henderson v. Ferrell, 183 Pa. 547, 553, 38 Atl. 1018. In neither pleadings nor briefs in this case is it contended that the well was not begun on April 8, 1922, nor that it was not completed with reasonable dispatch, nor that it did not produce in paying quantities."

It were idle to assume, had not the defendants been relying upon the Harrison lease, and the 1923 lease but a confirmation and correction thereof, that they would have started drilling a well in June, and permitted their case to lapse or be forfeited on August 6th, after the expenditure of money sufficient to drill the well to approximately 2,000 feet.

We do not feel called upon to pass upon the question as to whether the commencement of a well upon leased land, within the period for which rentals are paid, and its prosecution with reasonable diligence to actual production, which production is obtained after the period when rentals would have been due, will have the effect of continuing the lease in full force and effect after such period, for being of opinion, from all the evidence in the instant case, that defendants were relying upon the terms of the original or Harrison lease covering the 200 acres, and having reached production in paying quantities upon a portion of the 200 acres, the lease remained in full force and effect so long as oil or gas is produced in paying quantities, and the leases of 1923 being executed but in confirmation of the original lease, and the change of ownership and interests necessitating such confirmation must be evidenced by two instruments, the judgment of the trial court should be reversed, and this cause remanded, with directions to the trial court to vacate its judgment for the intervener, and render judgment for defendants.

By the Court: It is so ordered.

Note.—See under (1) 27 Cyc. pp. 727, 739. (2) 1 C. J. p. 6 §7; p. 7 §8. (3) 29 Cyc. pp. 1114, 1115; 20 R. C. L. p. 346; 3 R. C. L. Supp. p. 1058; 4 R C. L. Supp. 1355; 5 R. C. L. p 1100. (4) 21 C. J. pp. 180, 183, §163; anno. 4 A. L. R. 44; 10