710 F.2d 1442
 Wilbur R. WHITE d/b/a Wilbur R. White Oil Enterprises, Wayne
Clark, John Rankin d/b/a Rankin Production Co.,
Joe H. Cunningham, Dan Cunningham and
Richard K. Goodwin, Plaintiffs-Appellees,
v.
CONOCO, INC., a Delaware corporation, Defendant-Appellant.
 No. 81-1969.
 United States Court of Appeals,
Tenth Circuit.
 June 22, 1983.
 
 Kenneth I. Jones, Jr., Oklahoma City, Okl. (James S. Matthews, Jr., Oklahoma City, Okl., with him on the brief) of Eagleton, Nicholson, Jones & Blaney, Oklahoma City, Okl., for plaintiffs-appellees.
 C. Harold Thweatt, Oklahoma City, Okl. (Steven L. Barghols, Oklahoma City, Okl., with him on the brief) of Crowe & Dunlevy, Oklahoma City, Okl., for defendant-appellant.
 Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Conoco, Inc. (Conoco) appeals from the final judgment of the trial court, following a jury verdict, awarding Wilbur R. White, et al. (White) compensatory damages of $400,000 and punitive damages of $50,000 for trespass to real property and deprivation of White's right to explore for oil and gas and/or breach of an implied or quasi-contract. This appeal was taken after the court denied Conoco's motion for judgment notwithstanding the verdict or, in the alternative, for new trial. We will affirm.
 
 
 2
 We undertake our review of the evidence in the record in the light most favorable to the prevailing party, White, with the rules firmly in mind that the appellate court does not retry the facts and that the party seeking to set aside a jury verdict must demonstrate trial errors which constitute prejudicial error or that the verdict is not based on substantial evidence. Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp., 571 F.2d 1144 (10th Cir.), cert. denied, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978). Jury findings on sharply conflicting evidence are conclusively binding on appeal inasmuch as jurors are charged with the exclusive duty of assessing the credibility of witnesses and determining the weight to be given to their testimony. Id.
 
 
 3
 In 1961 the Oklahoma Corporation Commission created the West Short Junction Unit as a secondary recovery project for the recovery of oil from the Hunton Lime-Bartlesville (Hunton) formation by waterflooding. This was a very large unit with many participating leases and owners. A plan of unitization was entered into among all of those having interests in the oil and gas underlying the unit. The plan called for a waterflooding operation, created an operating committee, designated Conoco as unit operator, and provided for marketing and accounting and abandonment of wells. Article 23.1 of the plan dealt with the authority of the unit operating committee to sell leases and wells owned by the unit. It provides:
 
 
 4
 ABANDONMENT OF WELLS: If the Operating Committee at any time desires to abandon any well completed in the Hunton Lime-Bartlesville Sand and salvage the casing and other equipment that is part of the well, the Lessee or Lessees of the Separately Owned Tract on which such well is located shall be notified in writing of such decision and shall be granted thirty (30) days from the receipt of such notice within which to elect to take over such well for the purpose of completing the same in some other formation not a part of the Unit Area. Any such Lessee electing to take over such a well shall pay the net salvage value of the casing and other equipment in and on the well, as determined by the Operating Committee and shall agree to assume full responsibility for the proper plugging and abandonment thereof at such time as the well is ultimately abandoned. No such well shall be operated or used for the production of Oil and Gas from the Unit Area and to that end the Lessee taking over such well shall immediately cause the Hunton Lime-Bartlesville Sand in such well to be sealed off in a manner satisfactory to the Operating Committee, it being understood that such Separately Owned Tract shall continue to participate in Unit Production despite the cessation of production from such well. In the event the Lessee of such a Separately Owned Tract does not elect to take over such well, the Unit Operator shall proceed properly to plug and abandon the same and salvage as much of the casing and other equipment therefrom as can economically and reasonably be salvaged.
 
 
 5
 Defendant's Exhibit 7, p. 31 (Emphasis supplied).
 
 
 6
 The oil and gas lease involved in this controversy is a part of the unit and is a 40-acre tract known as the Smith Lease. In 1971, Conoco, as unit operator, drilled a well on the Smith Lease known as Smith No. 1 or No. 138. The well was drilled into the Hunton formation at a depth of about 7,900 feet. This well produced oil in paying quantities until July of 1973. The Smith Lease was owned by Union Texas Petroleum and Texas Pacific Oil Company, Inc., both of which were members of the unit operating committee. For convenience they shall jointly be hereafter referred to as Union Texas. Union Texas, when notified by Conoco, on behalf of the operating committee, that Smith No. 1 well was no longer productive in paying quantities, determined to purchase the well and shut it in because they intended to drill down and test the Viola formation--which is below the Hunton formation.
 
 
 7
 On July 13, 1973, Conoco, as unit operator, released, sold and transferred the Smith No. 1 well to Union Texas for about $545.00. The purchase agreement required Union Texas to comply with all terms of Article 23.1 of the unit plan, supra. Smith No. 1 was one of three wells in the unit purchased by Union Texas, as lessee, from Conoco on July 13, 1973. Union Texas intended to employ these wells to test the Viola formation. For reasons unexplained in this record, the Smith No. 1 well and some six other wells acquired by Union Texas from the unit were "shut in" at the surface, i.e., the valves on the wellheads at the top of the casing were closed, and no drilling was undertaken by Union Texas.
 
 
 8
 The testimony of Mr. Ralph Moore, a division manager of production for the Oklahoma City division of Conoco who held a degree in engineering, was consistent with that of other witnesses relative to the facts. He testified that: there were some 200 wells in the West Short Junction Unit; Conoco, as unit operator, had released about 13 wells to lessees; the operating committee had not met for the two year period he had served as division manager in Oklahoma City; when the Smith No. 1 well became uneconomical in the early 1970's, Conoco determined to release it, together with other wells in the unit; in late 1978, Conoco noticed that the wellhead on Smith No. 1 was leaking, and after Union Texas had been notified, its representatives removed the wellhead valve and installed a new one; during the process of replacing the wellhead valve, some 200 barrels of oil were "bled" off the well, which was the first indication to Conoco that there was oil in the Smith No. 1 wellbore; about a year later, in August of 1979, another leak developed in the Smith No. 1 wellhead and in the process of installing a new valve Conoco lifted out by tank truck some 40 barrels of oil; Conoco discovered soon thereafter that the Smith No. 1 well had in excess of 2,000 pounds of pressure on it; Conoco had known since 1973 that Smith No. 1 had been "shut in" at the surface by Union Texas and no demand had been made to inform Union Texas to plug and abandon the well; at no time prior to 1978 had Conoco attempted to reacquire the Smith No. 1 well; after it discovered the oil in Smith No. 1 well borehole and pressure in excess of 2,000 pounds, Conoco decided to attempt to reacquire the well; Conoco, in October, 1979, wrote to Union Texas offering to reacquire the Smith No. 1 well; Union Texas notified Conoco that it had assigned and sold the Smith No. 1 well and all rights under the subject lease except those depths, zones and formations included in and a part of the West Short Junction Unit to White, whereby White assumed the obligation to hold Union Texas harmless from any claims arising with regard to the unitized zones and to plug and abandon the well in accord with Oklahoma law; on November 9, 1979, Conoco wrote White and offered to purchase the Smith No. 1 well from him; White responded on December 3, 1979 that he believed that there was some potential of commercial production of oil from the Prue formation but that he would entertain an offer; on March 12, 1980, Conoco offered White $10,000 for an assignment of the Smith No. 1 well, having been authorized to offer as much as $20,000 for the well, notwithstanding company counsel's advice that Conoco could, as unit operator, use Smith No. 1 well to recover oil from the unitized formation because of the failure of White or Union Texas to "seal off" the unitized formation pursuant to Article 23.1 of the plan of unitization, which constituted abandonment of the well; on March 18, 1980, White wrote Conoco that he would sell Smith No. 1 well for $50,000.00, demanded that Conoco immediately cease and desist from using the well (Conoco had connected a flow line to Smith No. 1 well on October 22, 1979), and warned that any further use of the well by Conoco would be considered an intentional, willful and wanton action, contrary to White's ownership; on March 21, 1980, Conoco did shut-in the well and it disconnected the flow line because of the threatened lawsuit; upon advice of counsel, Conoco reconnected the flow line to the well and resumed production therefrom on May 14, 1980; White filed this suit on July 15, 1980; from approximately October, 1979, to February, 1981, Conoco produced some 6,911 barrels of oil, with a value of $258,178.33, from the Hunton formation through the Smith No. 1 well; Conoco did not request or demand that Union Texas or White "plug off" the Hunton formation or otherwise plug and abandon the Smith No. 1 well. [R., Vol. VI, pp. 131-161.]
 
 
 9
 White, who holds a degree in petroleum engineering, is a small oil producer and resides in Moore, Oklahoma. He testified, inter alia, that: since 1949 he has been engaged in drilling and completing oil and gas wells, and in buying and selling pipe or tubing; on September 12, 1979, he, doing business as Wilbur R. White Oil Enterprises, acquired for himself and associates partial assignments of oil and gas leases and bills of sale to some five leases and seven wells, including the Smith No. 1 well, from Union Texas for $32,500.00, with the prospect of using those wells to drill and test for production of oil in the Prue formation above the Hunton formation, or the Viola or Bromide zones below the Hunton formation; the use of the "hole" of a well already drilled to the Hunton formation for tests of the Prue, Viola or Bromide formations would constitute savings of about $200,000 per well; White had reentered two of the wells acquired, the Kyslea No. 2 well and Smith No. 2 well, offsetting Smith No. 1 well, at total drilling cost of $257,000, to test the Prue zone; White had an electric log which led him to believe that the Smith No. 1 well was capable of producing oil and gas from the Prue zone and he also believed, from observing data from various wells in the Cleveland County, Oklahoma, area, that the Viola zone was productive; had he determined to use the Smith No. 1 well, he was fully aware of the necessity of protecting the reserved Hunton formation by either bridging off or inserting a plug above, if drilling to the Prue zone and, if drilling to the Viola zone below the Hunton formation, pumping cement into the existing perforation under pressure, letting the cement set up and then drilling that back out before deepening the hole; Conoco took possession of Smith No. 1 well without his permission or knowledge; Conoco's representative informed White that it intended to reopen Smith No. 1 well while a purchase price was being negotiated; Conoco rejected White's offer of $50,000 for acquisition of Smith No. 1 well and subsequently reopened the well and placed additional equipment on the wellhead, including a valve and choke, without his permission; that in October, 1979, it would have cost Conoco about $350,000 to drill a new well on the Smith lease to the Hunton formation; that shutting the Smith No. 1 well off at the surface was the same as sealing it off in the Hunton formation until such time as other perforations were made in another zone being tested; he accepted, by assignment, the ultimate responsibility for plugging the well if a determination should be made to abandon it; White had never abandoned Smith No. 1 well and at no time had any intention of doing so; when White purchased the seven wells, including the Smith No. 1 well, he soon thereafter notified a Conoco field foreman that the well would be shut in at the surface because he and his associates planned to use it. [R., Vol. VI, pp. 46-124].
 
 
 10
 The record further reflects that: the unit operating committee did not, at any time, issue any instructions or directions relative to the method of "sealing off" a well; there is no universal or standard agreement as to the method of "sealing off" a well, except that it is generally agreed to signify such "sealing" of a well as will prevent the flow of liquids from the wellbore at the surface; that if a well should be acquired for further drilling, it is not consistent with such acquisition to "plug and abandon" the well in a formation or zone which must be drilled through in order to test a deeper formation; if one acquires a well with the intention of drilling a deeper well, it is prudent and proper to "shut-in" the well at the surface rather than to seal off a shallower formation in a permanent manner; Conoco was aware from the time that Union Texas acquired the well until it reentered it without permission or consent that the Smith No. 1 well was simply "shut-in" at the surface.
 
 
 11
 On appeal, Conoco contends that the trial court erred in: (1) instructing the jury that shutting-in Smith No. 1 well at the surface sealed off the formation as required by the contract; (2) instructing the jury that White was in "constructive possession" of the wellbore; (3) instructing the jury as to the measure of compensatory damages; and (4) submitting to the jury White's claim for punitive damages.
 
 I.
 
 12
 Conoco contends that the trial court erred in instructing the jury that shutting-in Smith No. 1 well at the surface constituted sealing off the unitized Hunton formation as required by the plan of unitization contract. We cannot agree.
 
 
 13
 Conoco moved for summary judgment prior to trial. It contended that, as a matter of law, White's failure to seal off the Hunton formation immediately as provided by Paragraph 23.1, supra, resulted in a forfeiture of the Smith No. 1 well. In opposition thereto, White argued that there was a genuine issue of material fact whether White abandoned the leasehold or any of the personal property and whether Conoco was estopped from asserting abandonment by its recognition of White's ownership. The trial court denied Conoco's motion and stated:
 
 
 14
 In this case there are, at a minimum, material factual questions involving intent of the parties which makes the case inappropriate for resolution on a motion for summary judgment. Questions of intent involve many intangible factors (such as witness credibility) that are best determined by a fact finder after a full trial. By way of example, the fact finder must determine whether, under the particular facts and circumstances as they occurred, Plaintiffs' actions with respect to the well were reasonable or whether they constituted a breach or an abandonment. Additionally, mixed questions of law and fact exist as to whether under the facts and circumstances, Defendant's failure to assert the alleged breach of failure to seal off the unitized formation constitutes laches or estoppel.
 
 
 15
 [R., Vol. I, pp. 143-144].
 
 
 16
 In the course of instructing the jury following presentation of all of the evidence, the trial court, per instruction No. 11, stated, in part:
 
 
 17
 With regard to the first and second elements [requirement that White prove, by a preponderance of the evidence that (1) he was the owner of Smith No. 1 well and leasehold estate except the Hunton formation and in actual or constructive possession of the same, and (2) White had the exclusive right to use the Smith No. 1 wellbore for the purpose of exploring zones and formations not part of the Unit], you are instructed that the Court has determined as a matter of law that the plaintiffs were the owners of the Smith No. 1 well and leasehold estate except for the zones and formations which form part of the West Short Junction Unit; that plaintiffs were in constructive possession, and that plaintiffs had the exclusive right to the use of the Smith No. 1 wellbore for purposes of exploring in zones and formations not part of the West Short Junction Unit.
 
 
 18
 [R., Vol. I, p. 268].
 
 
 19
 Elements 3 and 4 of this instruction required that White prove, by a preponderance of the evidence, that Conoco entered upon the leasehold and without authority of law or permission of White took over control and possession of Smith No. 1 and wellbore, thereby depriving White of the ability to explore for gas or oil, and that White incurred damage which was proximately caused by said conduct. [R., Vol. I, p. 268].
 
 
 20
 Conoco would have this court, contrary to the testimony of the witnesses and the documentary evidence presented, apply the technical terms and definitions of "shut-in-well" and "sealing off" in support of its contention that Paragraph 23.1 of the plan of unitization "does not provide for the shutting-in of the well, or even the sealing off of the well, but rather provides for the sealing off of the Unitized Formation in the well." [Opening Brief of Appellant, p. 8].
 
 
 21
 Conoco would have this court ignore, just as it urged the trial court to ignore, the facts, circumstances and practices which controlled and governed insofar as Smith No. 1 well and the leasehold interest is concerned. The array of witnesses and documentary evidence established that no interested party, including Conoco, interpreted Paragraph 23.1, supra, as here urged by Conoco. We will not repeat the facts. They do, however, support the jury verdict. They particularly support the proposition that the purpose of the sealing off requirement was to prevent oil from the unitized formation from being lost to the unit. Shutting-in Smith No. 1 well at the surface accomplished this purpose and did not injure or destroy the unit's rights or property. White's interpretation of "shutting-in" at the surface as constituting compliance with the "sealing off" requirement of Paragraph 23.1, supra, is fully justified by virtue of the testimony of Union Texas that it purchased Smith No. 1 well, subject to the reserved Hunton formation rights of the unit, from Conoco with the intention or possibility of drilling a deeper test, using the same well, with full knowledge that it had assumed the ultimate obligation to plug the well if a future determination should be made to abandon it, and White's testimony that he and his associates acquired Smith No. 1 well from Union Texas under the same conditions with intentions of using the well to drill either to the Prue zone or the Viola zone.
 
 
 22
 In Gannon v. Mobil Oil Co., 573 F.2d 1158 (10th Cir.), cert. denied, 439 U.S. 867, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978), we recognized that under Oklahoma law the issue of abandonment of an oil or gas well is one of intention. We cited and quoted Amax Petroleum Corporation v. Corporation Commission, 552 P.2d 387 (Okl.1976) for this rule and further observed:
 
 
 23
 In the case at bar there can be no dispute that Mobil clearly announced its intention to relinquish the wells and the lease premises. Thus, Mobil's intention was affirmatively declared. Such acts constitute a relinquishment of the premises. See: Dow v. Worley, 126 Okl. 175, 256 P. 56 (1926); Carter Oil Co. v. Mitchell, 100 F.2d 945 (10th Cir.1939); 1 Am.Jur.2d Secs. 1, 39 and 40. Under Oklahoma decisions, the "abandonment" of an oil and gas lease comes about with a concurrence of an intention to abandon and the act of physical relinquishment. Magnolia Petroleum Co. v. St. Louis-San Francisco Ry. Co., 194 Okl. 435, 152 P.2d 367 (1944).
 
 
 24
 While cessation of operations under an oil and gas lease is not alone sufficient to establish abandonment [Fisher v. Dixon, 188 Okl. 7, 105 P.2d 776 (1940) ], it has been held that an unreasonable delay by the lessee in undertaking further exploration coupled with the lessee's declaration that further drilling would be unprofitable is sufficient evidence to establish abandonment. Fox Petroleum Co. v. Booker, 123 Okl. 276, 253 P. 33 (1926). See also: Doss Oil Royalty Company v. Texas Co., 192 Okl. 359, 137 P.2d 934 (1943); Dow v. Worley, supra. Both elements were clearly established on the part of Mobil in the instant case.
 
 
 25
 Gannon, supra, 573 F.2d at pp. 1164-65.
 
 
 26
 In the instant case, the elements of abandonment were not established. Thus, the jury did not err in finding that Conoco had committed a trespass by entering upon the leasehold area without authority or permission of White and taking control and possession of Smith No. 1 well, thus depriving White of his property and the right to explore for oil or gas therefrom.
 
 
 27
 The trial court did not err in instructing the jury that White had properly "sealed off" Smith No. 1 well and the court did not err in Instruction No. 11 relative to the elements of proof required of White in order to establish the trespass committed by Conoco. Conoco had knowingly released the Smith No. 1 well and the leasehold from the unit after determining that production from the Hunton formation was no longer profitable. The well was sold to Union Texas for valuable consideration with reservation of the Hunton formation rights to the unit and Union Texas's assumption of the obligation ultimately to plug the well upon its abandonment. Union Texas acquired the well with the prospect of drilling into a formation other than the Hunton. White, in turn, acquired Smith No. 1 well and the leasehold subject to the unit's rights in the Hunton formation. White, too, anticipated use of the well to drill to either the Prue or Viola zones. White, too, assumed the ultimate obligation to plug and cement the well upon its abandonment.
 
 II.
 
 28
 We have carefully considered the balance of the claims of trial court error advanced by Conoco and we hold that they are without merit. The trial court properly instructed the jury on the appropriate measure of compensatory damages and the jury verdict in this regard is fully supported in the record. When Conoco unlawfully assumed dominion and control of Smith No. 1 well contrary to White's property rights, Conoco deprived White of the right to use that well to drill to either the Prue or Viola zones. Under such circumstances, the proper measure of compensatory damages was the cost to White in drilling a new well from the surface to the depth of the Viola zone or formation.
 
 
 29
 The evidence in this record further justifies the submission of the punitive damage instruction by the court and the punitive damage award by the jury. Punitive damages are properly awarded when a wrongdoer acts willfully, wantonly or in reckless disregard of the rights of another, resulting in injury. Basden v. Mills, 472 P.2d 889 (Okl.1970) (also holding that an award of punitive damages is peculiarly a matter for jury determination and that such determination will not be interfered with lightly upon a claim of excessiveness); Oller v. Hicks, 441 P.2d 356 (Okl.1967); Cooperative Refinery Association v. Young, 393 P.2d 537 (Okl.1964).
 
 
 30
 In Miller v. Tidal Oil Co., 161 Okl. 155, 17 P.2d 967 (Okl.1932), the court defined a good faith trespasser as one who acts without culpable negligence or willful disregard of the rights of others and in an honest, reasonable belief that his action is proper. The facts of the instant case do not fit that niche. There is substantial evidence in this record from which the jury could conclude, as in fact it did, that Conoco did not honestly and reasonably believe it had the right to assume dominion, control and possession of Smith Well No. 1 contrary to White's valuable property rights. A jury's award of exemplary damages will not be held excessive unless it appears to be grossly so or the result of passion, prejudice or improper sympathy. Cities Service Oil Co. v. Merritt, 332 P.2d 677 (Okl.1958). No such showing has been made in the case at bar.
 
 
 31
 WE AFFIRM.